A



# Department of Public Safety
## BUREAU OF POLICE

To: Capt. T. Adams

From: Ptlm. R. Hill

Date: 06-19-99

Subject: Morning of 06-17-99

Sir,

    At approximately 2240hrs. on 06-19-99, Sgt. J. McCall advised
me to write you this letter explaining why Car B-1(DiLoreto), and
my car A-1(with Wierbinski) were allegedly "speeding" across
W.6th Street passing cars on the morning of 06-17-99. In regards
to that morning, car A-1 and B-1 had an alarm call towards the end
of shift on the west side of Erie. The call was over, and both
units headed-in. Car B-1 saw fit to hurry in with flashing lights
and Relco on. Car B-1 did pass cars as they moved out of his way.
Car A-1 was several city blocks behind Car B-1 the entire time, but
citizens still waited for A-1 to pass before they resumed their
travel. Knowing the City of Erie policy on Relco usage, I activated
my flashing lights whenever Wierbinski drove through an intersection
where DiLoreto had the Relco on and cars were waiting. As Wierbinski
drove, it was not at an unreasonable speed as both he and I detest
Police Officers driving like they shouldn't be.

Sincerely,

Robert W. Hill
Patrolman,EPD

B



# Department of Public Safety
# **BUREAU OF POLICE**

**TO:**  Chief Paul J. DeDionisio

**FROM:**  Cpt. D. Van Buskirk

**DATE:**  9DEC99

**SUBJECT:**  Request For Disciplinary Action; Ptlm. G. DiLoreto

Sir:

On 1DEC99,  Officer DiLoreto was scheduled for a preliminary hearing in Central Court.  He failed to appear. Although Diloreto was on vacation from 27NOV99 until 6DEC99, he received his notice on 18NOV99.  He made no attempt to cancel or continue the hearing.

This incident was preceded by a missed hearing on 1OCT99  for which he received a written warning for.

As indicated below, this officer has a history of disciplinary problems;

23JUN98  -  inappropriate language to a Supervisor
22OCT98  -  missed hearing
23DEC98 -  3 day suspension (allowed to work off) for court demeanor
18JAN99 -  written warning for inappropriate language to a waitress
25JUN99  -  reckless operation of Bureau equipment

Regarding the matter at hand, I am requesting and recommending a 3 day suspension without the option of working days off.

**Violation:**  Rule 39, Erie Bureau Of Police Rules and Regulations, "members or employees of the Bureau of Police who have hearings or cases in any court shall be punctual in attendance".

cc. Deputy Chief R. Szychowski
attach: 5

Respectfully submitted;

*Cpt. D. Van Buskirk*
Cpt. D. Van Buskirk

C



# DEPARTMENT OF PUBLIC SAFETY
# BUREAU OF POLICE

## CITIZEN COMPLAINT

I, _Jeffrey C Russell_, hereby accuse_____,
a member or employee of the City of Erie Bureau of Police, of misconduct
and or improper procedure, the facts of which are set forth below. I
formally request that the incident be investigated in accordance with the
Bureau of Police Rules, Regulations, and Procedures. I understand that I
may be required to give additional statements to investigators and attend
public hearings of this matter and that my failure to do so will result in
dismissal of this complaint.

I further certify, <u>under penalty of perjury</u>, that all facts set forth in this
complaint are true and correct.

_Jeffrey C Russell_
**(Signature**

_Jeffrey C Russell_
**Name (please print)**

Sworn and subscribed before me
this _14th_ day of _June_ ,199_9_

_3831 Meadow Dr. Erie PA 16506_
**Address**

_Notary Public_

_838-3995_ I _____
**Home Phone   -   Work Phone**

Notarial Seal
Gary J. Krzeszewski, Notary Public
Erie, Erie County
My Commission Expires Nov. 28, 2002
Member, Pennsylvania Association of Notaries

Please describe below the facts relevant to your complaint, giving dates, times, places
and names of witness, etc. ( Please print or type and use additional sheets if
necessary)

Form 118B

<u>CITIZEN COMPLAINT</u>

ATTENTION: Captain Van Buskirk—

Monday, June 14, 1999

On Tuesday, June 8th, 1999 during the early morning hour between 2:00am and 2:20am I was pulled over at the corner of 14th and French {I had just made a right hand turn heading south on to French Street which is one way North to South}.  The Erie Policeman who pulled me over before asking for my driver's license and registration uttered, "Well that was a really stupid thing to do wasn't it?", in which I asked, "What was really stupid?", this Erie officer claimed that I ran the red light at the corner of 14th and State while making a left hand turn on to 14th heading east toward French, while he {this Erie Officer} was coming from the alley way, behind Calamaries, on to 14th heading west toward state street.  We actually passed one another before this officer made a u-turn on 14th where he proceeded to get behind me and pull me over on French and 14th street.  I proceeded to tell this officer that as I was entering the intersection at 14th and state, the light was <u>definitely</u> green and that I had believed that I did not commit a traffic violation by going through any red light.

## CITIZENS COMPLAINT CONTINUATION

This officer was not very pleased with my strong conviction of the proceeding event since he repeatedly asked me, " Do I want to change my story?" which I defiantly answered, "No".  He then again asked if I wanted to change my story, I told the officer that the only way that the light at 14th and state could have ever changed red so quickly is if he had changed it himself because I was dead certain that the light at 14th and state was absolutely not red when I was making my left hand turn on to 14th heading east toward French.

As the officer checked my license and registration, he proceeded to tell me that he was on his way to assist another officer on another call, which only solidifies what could have happened to the light at 14th and state, that is, as I entered the intersection the light immediately turned red.

As my background information was cleared, this officer proceeded not to issue me a ticket, or even a written warning, instead this officer began to reveal himself as a racist/prejudicial person employed as a Erie Policeman.

## CITIZENS COMPLAINT CONTINUATION

Why I am actually writing this citizen complaint is not for the faulty traffic stop, but for the way this officer conducted himself and his demeanor toward an Erie citizen who did nothing wrong.  His conduct was uncalled for to the extent that racial and prejudicial overtones were uttered from this officer's mouth.  As this traffic stop was coming to an end, this Erie Police Officer explained to me, and these are his exact words, "You know, I patrol this area looking for bums and fags!"  He proceeded to say, "That I'm going to let you go on your merry little way to have your merry little evening!"  Being in the Social Work field acquiring my degree at Mercyhurst college, I have come away with the knowledge necessary to respect ALL people regardless of their race, religion, or sexual preference. It happens to be a focal point of the Social Workers' Code of Ethics.  I am sure that the Erie Police Department follows a similar code of ethics when dealing with the public.  This Erie Officer however appeared to be following his own code of ethics, and what frightens me more is if and when this officer does pull over someone who may sound and act gay to him, what senseless harm might come of it.

## CITIZENS COMPLAINT CONTINUATION

Unfortunately I was unable to get this officer's badge number since he was taller than the hood of my car and appeared to stand to my far left side; however, I can say that he was a big guy about 6'3" or 4" tall and weighed around 210-220lbs, he had a full face and wore what appeared to be gold wire rimmed glasses. He was driving a dark navy blue police cruiser; however, I could not see what number his patrol car was since I was facing south on French which is one way and he was located behind my vehicle. I know that by checking the dispatchers notes for that evening you should have no problem identifying this officer. Not to mention as he stated he Patrols that area looking for "Bums" and "Fags", so the officer who was in the area of 14th and French on Tuesday morning June 8th between 2-2:20am was the officer who pulled me over.



# Department of Public Safety
## BUREAU OF POLICE

TO:  CPT ADAMS

FROM:  PTLM DILORETO

SUBJECT:  COMPLAINT

Sir,

On 6-8-99 at apx 0230 hrs. I conducted a traffic stop near
E. 14th and French st. for a red light violation I had observed
at 14th and State St. .  When I stopped the violator, a Jefferey
C. Russell, I informed him why I was stopping him and asked him for
his Driver's license, registration and current proof of insurance.
Mr. Russell did produce the requested information but was argument-
ative with me about the nature of the stop.  He felt that he had
not gone through the red light in question.  I ran computer checks
to verify his driving status and validity of the registration and
also ran warrant checks.  This is standard procedure whenever I
make a traffic stop.  When every thing came back O.K. I decided
to release the driver with a verbal warning about the violation.
I also advised Mr. Russell that he was in an area frequented by
vagrants and homosexuals to include male prostitutes and that
we had had several complaints from area business owners, patrons
and citizens to this effect.  I used the terms "bums and fags"
when I told him this not expecting him to take any offense and
certainly not intending any personal attacks.  I did not feel
that Mr. Russell was either a homosexual or a vagrant.  I never
intended any disrespect and must note that a senior officer was
present on the scene and knowing this and the fact that the
officer is also an FTO, OFC. Chandley, I would not want to em-
barrass him, myself or this department.  I apologise for the use
of these slang terms but I meant no ill will toward Mr. Russell.
I will also note that I did not choose to cite for the violation
explaining to Mr. Russell the low traffic flow at that time and
That I did not consider the violation to be very serious at the
time.  I will make all efforts to use a more professional jargon
in the future.

Respectfully submitted,

#303



# Department of Public Safety
## BUREAU OF POLICE

TO:      Capt. Adams
FROM:    Ptlm. P. Chandley #267
DATE:    062399
RE:      Complaint


Sir,
      On 060999 at approx. 0230 hrs., I assisted as the backup officer at a traffic stop conducted by Ptlm. Diloreto in the area of East 14th and French Sts.
      Upon my arrival, the stop had already been completed and Ptlm. Diloreto was speaking to the driver.  I took up a position on the passenger side of the sportscar and ran driver's check and recieved the registration from the radio operator.  I overheard Ptlm. Diloreto explain the violation that had been alledged.  There was appearantly some disagreement on that point and Ptlm. Diloreto explained that he had been in the area due to complaints from the area businesses about the vagrants and homosexuals loitering about in the alleys.  Ptlm. Diloreto used the terms bums and fags, but I do not believe it was done in a derogatory manner, just a manner of speach.
      The driver was issued a verbal warning for the red light violation and released afterwards. I do not recall Ptlm. Diloreto stating for him to be on "his merry little way" or "merry evening" as alledged in the citizen's complaint.

                              Respectfully submitted,

                              Ptlm. P. Chandley #267
                              06-23-99



# Department of Public Safety
# BUREAU OF POLICE

**To:**  **Inspector  H. G. STRICKLAND**   **Internal Affairs**

**From:**  **Capt. T . ADAMS**   **Shift Comm.**

**Date:**  **June 23, 1999**

**Subject:**  **Citizen's Complaint  Jeffrey C. Russell**

---

Sir;

Reference   the attatched CITIZEN'S   COMPLAINT, against Ofc. G. DILORETO, by JEFFREY C. RUSSELL,  on actions or choice of verbage used by him  during a traffic stop on JUNE 08, 1999, reports were gathered as to the veracity of the complaint.

Ofc. G. DILORETO  readily admits to using inapropriate language of BUMS and FAGS  , but felt that the party he was talking to was not  of  an alternate sexual lifestyle, and would not be offended by the terminology. He denies that he told Mr, RUSSELL ' I'm  going to let you go on your MERRY little way to have your MERRY  little evening .' Ofc. P. Chandley  was also present at the traffic stop and remembers the use of ' BUMS and FAGS ' but also refutes Ofc. G. DILORETO  making any other remarks that would have been out of taste.

Ofc. G. Diloreto was cautioned in his choice of verbage and instructed on profesionalism when acting as an agent for the CITY of ERIE. In the future , Ofc G. Diloreto will act in a more profesional manner when dealing with the Citizens of ERIE. Ofc. G. Diloreto is sorry that Mr. Russell took umberage to his remark about BUMS AND FAGS,  but feels that he is not  HOMOPHOBIC, and there is no need for Mr. Russells' reaction and feelings of oppression.

I recomend no further action against Ofc. G. Diloreto at this time, however, any further complaints of this type will be delt with in the strongest fashion.

RESPECTFULLY

D

# DEPARTMENT OF PUBLIC SAFETY
# BUREAU OF POLICE

## CITIZEN COMPLAINT

I, _Nicole Aggelakos_, hereby accuse _Officer Gregg_
a member or employee of the City of Erie Bureau of Police, of misconduct and/or
improper procedure, the facts of which are set forth below. I formally request that
the incident be investigated in accordance with the Bureau of Police Rules,
Regulations, and Procedures. I understand that I may be required to give additional
statements to investigators and attend public hearings of this matter and that my
failure to do so will result in dismissal of this complaint.

I further certify, __under penalty of law,__ that all facts set forth in this complaint are
true and correct.

_Nicole Aggelakos_                    _Nicole Aggelakos_
__(Signature)__                       __Name (please print)__

Sworn and subscribed before me
This ___4th___ day of ___September___, 2001      ___306 North St. Meadville___
                                       __Address__   _NEW Cell 720-470_

___James Klemm___                     ___336-2992  1-877-2423___
__Notary Public__   _City Clerk_       __Home Phone__   __Work Phone__


Please document, below, the facts relevant to your complaint, giving dates, times, places and
identity of witnesses, etc. ( Please print or type and use additional sheets if necessary)

The day of September 1st, 2001 at 11:30 P.M. At The Location
of A & P Mini Market on 26th and STATE, While entering store
asked Police officer to watch car because windows were down and
many people were around. Exit Store. Police officer called me
over to car and said I was "good looking" and would like
to get my phone number. After giving him phone number
Police officer insisted meeting for breakfast after his shift.
I told him no, He said then can we find a place more secluded to meet now.

FORM 118B   REV 9/00

## CITIZEN COMPLAINT CONTINUATION

Told officer no. Had to leave to get back to Meadville. Told me Meadville was out of his patrol area and could not follow me home. Insisted on telling me the night was still young, did not matter what I was wearing. All that turned him on was sexy underwear. Told him that I had to go again. Officer said I will follow you to the Highway and pull you over to see your sexy underwear. Told him goodbye. Got into car and left parking. Down State to bayfront, officer followed. Every light and every lane switch on way to bayfront officer would pull beside car. Yelling out window (officer) I will follow you to the Highway. Got onto bayfront still following me. Finally turned around by Condos on bay front. When returned home. Phone ringing. Answer phone, it was police officer. Told him not a good time to talk. He asked when a good time to talk. Said call back in 10 minutes. Left apartment. Returned later that night. with hang ups on answering machine. Next day received two prank calls from officer.

FORM 118B    REV 9/00



# Department of Public Safety
## BUREAU OF POLICE

TO:        **Deputy Chief Szychowski**

FROM:      **Sgt. K. Werner**

DATE:      **September 2, 2001**

SUBJECT:   **Officer Conduct**


Sir,

While working as Officer in Charge I received a telephone call from a ~~Nicole Aggelakos.~~ Nicole works at Hamot emergency room second shift. She stated that on ~~09-01-01 at around 2300 hours,~~ she had just left work and went to the A-Plus mini mart at 26th and State Sts. When leaving there she noticed a police car behind her. She was pulled over at 14th and State Sts. The Officer was alone in the unit. She stated the Officer approached and asked her for her telephone number. The Officer also stated that she was cute and wanted to know if she would go to breakfast with him in the morning, as he was done at 0700 hours. Nicole stated she was very nervous and felt that she would get a ticket if she did not give him her telephone number. She stated that the telephone was ringing when she got home and it was the Officer.

Nicole also related that the Officer told her that he was going to follow her onto the highway and that he wanted to see her panties. Nicole stated she was confused and at a loss as to what action, she should take. After speaking with her today, she is afraid of leaving work tonight. She lives in Meadeville, Pa. In addition, related to me that she is afraid of being pulled over on a dark highway on the way home.

Nicole did not get the car number, but gave a description of the Officer. She stated his name was ~~Greg,~~ (he told her that), he wore glasses, was heavy set, short dark hair, and had no facial hair.

Sgt. Angelotti took a complaint form down to Hamot ER this date and advised her that if the Officer showed up when she was getting out of work to call us. Nicole works in Hamot ER and can be reached there on second shift. Her home telephone number ~~is 814-336-2093~~ she lives at 306 North Street Meadeville, Pa.

# GROUP III
# SERGEANT'S
# ACTIVITY REPORT

DATE ___11___    SERGEANT: _____

| ASSIGNMENTS | BADGES | RADIO # | CAR # |
|---|---|---|---|
| **SHIFT COMMANDER:** Lt. Juhas | 94 | | |
| **OFFICER IN CHARGE:** | | | |
| **STREET LIEUTENANT:** | | | |
| **STREET SERGEANT: C-1** Sgt Liehil | 222 | | |
| **STREET SERGEANT: C-2** | | | |
| **STREET SERGEANT: C-3** Sgt McCall | 246 | | |
| | | | |
| **RADIO:** Brown | | | |
| **SWITCHBOARD:** Zimmer | | | |
| **SCOPE:** Scot | | | |
| **CLERK:** Miski | | | |
| **CLERK:** Casale 8 Hrs | | | |
| **SECURITY OFFICER:** Yacco | 124 | | |
| **EARLY BEAT CARS** | | | |
| **A-1:** Col Hill - Baney | 284-356 | 111- | A-1 |
| **A-2:** Dihilla - Filotee | 310-317 | 115-117 | A-2 (E-6) |
| **B-1:** Dilulla | 220 | 91 | B-1 |
| **B-3:** Col Crawford | 286 | 75 | B-3 |
| **Q-1:** Wilson - Gatti | 340-336 | 139-87 | Q-1 |
| | | | |
| | | | |
| **LATE BEAT CARS** | | | |
| **A-3:** Rounds - Ondocks    (Rounds Early Out) | 322-358 | 136-101 | A-3 |
| **A-4:** Seraitt - Taegans    ot | 307-314 | 81-144 | A-4 |
| **B-2:** | | | |
| **B-4:** Dilorato | 303 | 178 | B-4 |
| **G-1:** Williams - Heumann | 213-228 | 93-94 | G-1 |
| | | | |
| | | | |
| **EXTRA CARS** | | | |
| | | | |
| | | | |

| **EXTRA RADIOS:** 47-50-51-52-53-54-60-77-79-92-185-195 | **EXTRA VEHICLES** | |
|---|---|---|
| **REMARKS** | **E-1** | |
| | **E-2** | |
| | **E-3** | |
| | **E-4** | |
| | **E-5** | |
| | **99** | |



# Department of Public Safety
# BUREAU OF POLICE

**TO:**           Inspector H.G. Strickland

**FROM:**      Cpt. D. Van Buskirk

**DATE:**       3SEP01

**SUBJECT:**   **Citizens Complaint Against Ptlm. G. DiLoreto**

Sir:

Per our conversation, I contacted the complainant in this matter, Nicole Aggelakos, at Hamot Medical Center this date. I posed two questions to her that needed clarifying in Sgt. Werners report.

**Q:** did you answer the phone when the officer called, after you got home?
**A:** yes
**Q:** what did he say?
**A:** he asked if I could talk. I hadn't had a chance to tell my boyfriend about the incident and I said "no". He asked if he could call back and I told him to call back in ten minutes. I then left with my boyfriend and I don't know if he called again.
**Q:** why did you head north after leaving the A-Plus to go to Meadville.
**A:** I only know the main streets in Erie and I know the A-Plus is open all night. I was going back down State St. to get to the Bayfront Parkway and I-79 to go home.

I inquired if she had completed the Citizen Complaint form and she said she had it done but there wasn't a Notary Public on duty today at the hospital. Pursuant to my conversation with you, I told her it would not be necessary to have it notarized at this time and that I would pick it up at Hamot tonight.

This completed our conversation and the complaint form is attached.

As you know, I spoke with you and Deputy Chief Szychowski earlier this date and we all agreed that the officer should be off the street pending the results of this investigation. The officer was contacted at home and told to wear old civilian clothes to work tonight. We are in dire need of extra cells. I will suggest to Cpt. Adams to have the officer begin emptying out A range, which has working doors, and placing all items into B range, of which cells 1,2, and 3 are broken. He will be further instructed to write a report to Sgt. Bugaj, indicating the location that any evidence has been moved to. It is my understanding that none of the items in A range have any significant evidentiary value.

Once A range is empty, it is requested that Maintenance power wash them and examine them to see that the water and toilets work and see if any welding is needed on the bottom rails and floors.

Further, I would suggest Sgt. Bugaj review what has been placed into B range and determine if the cells need to be secured with chains and padlocks.

Respectfully submitted;

Cpt. D. Van Buskirk

cc. Chief Paul J. DeDionisio
   Deputy Chief Szychowski
   Cpt. Adams
   Lt. Skrypzak
   Sgt. Bugaj

## CRIMES AND OFFENSES

- update your research with the most current information
- expand your library with additional resources
- retrieve current, comprehensive history and citing references to a case with KeyCite

For more information on using WESTLAW to supplement your research, see the WESTLAW Electronic Research Guide, which follows the Preface.

---

### ARTICLE E

#### OFFENSES AGAINST PUBLIC ADMINISTRATION

**Chapter**
45. GENERAL PROVISIONS
47. BRIBERY AND CORRUPT INFLUENCE
49. FALSIFICATION AND INTIMIDATION
51. OBSTRUCTING GOVERNMENT OPERATIONS
53. ABUSE OF OFFICE
55. RIOT, DISORDERLY CONDUCT AND RELATED OFFENSES

### CHAPTER 53

### ABUSE OF OFFICE

**Section**
5301.   Official oppression.
5302.   Speculating or wagering on official action or information.
5303.   Liability for reimbursement of costs for outside counsel.

#### Cross References

Misdemeanor,
    Defined, see 18 Pa.C.S.A. § 106.
    Penalty, see 18 Pa.C.S.A. § 1104.

#### WESTLAW Electronic Research

See WESTLAW Electronic Research Guide following the Preface.

## § 5301.   Official oppression

A person acting or purporting to act in an official capacity or taking advantage of such actual or purported capacity commits a misdemeanor of the second degree if, knowing that his conduct is illegal, he:

(1) subjects another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights; or

ABUSE OF OFFICE                    **18 Pa.C.S.A. § 5301**
                                                      Note 1

(2) denies or impedes another in the exercise or enjoyment of
any right, privilege, power or immunity.

1972, Dec. 6, P.L. 1482, No. 334, § 1, effective June 6, 1973.

### Official Comment—1972

This section is derived from Section 243.1 of the Model Penal
Code.

Existing law does not contain a provision specifically penalizing
official oppression. The provisions of The Penal Code of 1939 (18
P.S. § 4101 *et seq.*) apply to conduct of an official as an individual.

This section creates a distinct crime which extends to all official
activities. It should be emphasized that clause (2) applies to the
denial of any right or privilege or protection to which a person is
legally entitled.

This section is intended to cover the use of official position to
wrong another. If an official privately commits a wrong he, of
course, will be subject to the same penalties as a private citizen who
does so.

### Historical and Statutory Notes

**Model Penal Code:**
This section is similar to § 243.1 of the
Model Penal Code. See 10 Uniform
Laws Annotated, Master Edition.

### Library References

Municipal Corporations ⚬747(1, 3).
Officers and Public Employees ⚬121.
Sheriffs and Constables ⚬153.
WESTLAW Topic Nos. 268, 283, 353.
C.J.S. Municipal Corporations §§ 758,
775 to 776.

C.J.S. Officers and Public Employees
§§ 255 to 259.
C.J.S. Sheriffs and Constables §§ 209
to 210.

### Notes of Decisions

In general  2
Bail Bondsmen  5
Defenses  10
Indictment and information  9
Judges  4
Limitations  7
Police officers  3
Private right of action  6
Restitution  12
Sentencing  11
Trial  8
Validity  1

___

**1. Validity**

Term "mistreatment" in official op-
pression statute was not unconstitutional-
ly vague as applied to judge charged with
official oppression based on alleged solic-

itation of woman who appeared before
him on driving under the influence
charges, despite defendant judge's allega-
tions that victim consented, since defen-
dant's treatment of victim was no less of
an abuse of his office because she may
have consented in order to assure dis-
missal of charges against her. Com. v.
Checca, 491 A.2d 1358, 341 Pa.Super.
480, Super.1985, appeal denied.

Application of this section to deputy
prison warden who was alleged to have
mistreated prison inmates by striking and
kicking them in the course of disciplinary
hearings was not unconstitutional, de-
spite the defendant's contention that term
"mistreatment" was impermissibly
vague. Com. v. Manlin, 411 A.2d 532,
270 Pa.Super. 290, Super.1979.

5

## 18 Pa.C.S.A. § 5301    PUBLIC ADMINISTRATION CRIMES

Note 2

**2.  In general**

Anyone acting in an official capacity in Pennsylvania, including a policeman, commits a misdemeanor if, knowing his conduct is illegal, he subjects another to arrest, detention, search, seizure, mistreatment or other infringement of personal or property rights or denies or impedes another in exercise of any of his rights, privileges, power or immunities. Com. of Pa. v. Porter, C.A.3 (Pa.)1981, 659 F.2d 306, certiorari denied 102 S.Ct. 3509, 458 U.S. 1121, 73 L.Ed.2d 1383.

Statute defining crime of official oppression applies to improper denial of aid, privilege or protection to which a person is entitled by law, as well as aggressive action against the individual. Com. v. Checca, 491 A.2d 1358, 341 Pa.Super. 480, Super.1985, appeal denied.

In order to constitute offense of "Official Oppression," person acting in "official capacity" must knowingly and illegally deny or impede another in the exercise of some "right," "power" or "immunity" or must knowingly and illegally subject another to arrest, detention, search, seizure, mistreatment, dispossession, assessment, lien or other infringement of personal or property rights. Com. v. Eisemann, 453 A.2d 1045, 308 Pa.Super. 16, Super.1982.

For purposes of offense of "Official Oppression," word "knowing" as used in connection with knowingly and illegally denying or impeding another in exercise of some right, power or immunity, means that accused must have been acting in "bad faith" when he subjected the other to the proscribed activities. Com. v. Eisemann, 453 A.2d 1045, 308 Pa.Super. 16, Super.1982.

As general rule officer in uniform is cloaked with authority of his office, and therefore, actions taken by him which constitute mistreatment of another may fairly be said, within terms of this section, to be "taking advantage" of that authority. Com. v. Stumpo, 452 A.2d 809, 306 Pa.Super. 447, Super.1982.

**3.  Police officers**

Although officer was not performing official act, such as making arrest, in dealing with cocktail waitress, where officer was on duty and armed when he blocked cocktail waitress' way as she attempted to leave service bar, and when

he yanked on her brassiere strap, and pulled down top of her leotard over her shoulder, officer's mistreatment of cocktail waitress was "taking advantage" of his official capacity within meaning of this section. Com. v. Stumpo, 452 A.2d 809, 306 Pa.Super. 447, Super.1982.

Motorist's conviction for driving while under influence of intoxicating liquor and resisting arrest did not, on principles of collateral estoppel, bar arresting officer's convictions of assault and official oppression based on the arrest, since motorist's acceptance into accelerated rehabilitative disposition program did not constitute an adjudication of guilt and Commonwealth and not defendant was the other party in that criminal action. Com. v. Baranyai, 419 A.2d 1368, 278 Pa.Super. 83, Super.1980.

**4.  Judges**

Defendant's action in using his position as a district judge to receive sexual favors from a woman whose case was pending before him was an illegal use of his office proscribed by the law against official oppression, and fact that victim may have solicited him at the outset made no difference where facts supported a conclusion that defendant agreed with her proposal. Com. v. Checca, 491 A.2d 1358, 341 Pa.Super. 480, Super.1985, appeal denied.

Judge's acquittal on charges of bribery was not inconsistent with his conviction for official oppression based on alleged solicitation of woman who appeared before him on driving under the influence charges, since evidence that defendant accepted a sexual favor, but did not do so in consideration for dismissing driving while under the influence charges, may have precluded a conviction for bribery, but such evidence would not necessarily negate element of crime of official oppression in that such crime requires proof only that defendant acted in his official capacity and, knowing his conduct to be illegal, subjected another to mistreatment. Com. v. Checca, 491 A.2d 1358, 341 Pa.Super. 480, Super.1985, appeal denied.

**5.  Bail Bondsmen**

Bail bondsman, who apprehended his bail jumping principal, transported him to destination in trunk of car, and drove through city with bail jumper tied to roof of car as an example to others tempted to

6

ABUSE OF OFFICE

18 Pa.C.S.A. § 530̇2

flee justice to bail bondsman's financial detriment, had authority to take bail jumper into custody, and violated official oppression statute, 18 Pa.C.S.A. § 5301, when he abused that authority, notwithstanding fact that bail bondsman was not public official. Com. v. Russ, 503 A.2d 450, 349 Pa.Super. 445, Super.1986, appeal denied 531 A.2d 429, 515 Pa. 621.

**6. Private right of action**

District court would not infer from Pennsylvania criminal code private right of action that would have effect of significantly increasing public officials' exposure to civil liability under state law; Pennsylvania Official Oppression Act set forth elements of crime but did not create private cause of action. Agresta v. Goode, E.D.Pa.1992, 797 F.Supp. 399.

**7. Limitations**

Prosecution for official oppression offenses was not barred by statute of limitations, where it began within ten years of alleged offenses, in light of extension to two-year limitations period to cover period while alleged perpetrator was still in public office or employment; exception included time of occupancy of office or employment or within five years thereafter, but not beyond eight years, so that, where defendant continued to occupy public office, maximum time for commencement of prosecution was ten years. Com. v. O'Kicki, 597 A.2d 1258, 408 Pa.Super. 518, Super.1991, appeal denied 626 A.2d 1156, 534 Pa. 637, reconsideration denied.

**8. Trial**

Trial court did not err when, during prosecution for perjury and obstructing the administration of the law, it placed notations on verdict slip seeking to identify for jury the separate counts charged. Com. v. Kelly, 399 A.2d 1061, 484 Pa. 527, Sup.1979, appeal dismissed 100 S.Ct. 417, 444 U.S. 947, 62 L.Ed.2d 317.

**9. Indictment and information**

Information charging in one-count crime of official oppression of 16 persons by unspecified acts occurring on undesignated occasions during one summer was

fatally defective for failure to comply with Pa.R.Crim.P., Rules 225 and 228, 42 Pa C.S.A., requiring that indictment contain statement of essential elements and date of offense and that there be separate count for each offense charged. Com. v̇. Baranyai, 419 A.2d 1368, 278 Pa.Super. 83, Super.1980.

Permitting information to be amended over defense objection by adding names of additional persons whom Commonwealth alleged had been oppressed by acts of misconduct of defendant violated Pa.R.Crim.P., Rule 229, 42 Pa.C.S.A., allowing amendment only if it does not charge an additional or different offense. Com. v. Baranyai, 419 A.2d 1368, 27̇ Pa.Super. 83, Super.1980.

**10. Defenses**

Where a public official, under color of his office, solicits or accepts a sexual favor in the course of discharging a duty of his office, assent of the victim is not defense to a charge of official oppression. Com. v. Checca, 491 A.2d 1358, 341 Pa.Super. 480, Super.1985, appeal denied.

**11. Sentencing**

Trial court did not abuse its discretion in sentencing defendant judge, convicted of official oppression based on alleged solicitation of woman who appeared before him on driving under influence charges, to 11½ months to 24 months imprisonment, in view of gravity of offense. Com. v. Checca, 491 A.2d 1358, 341 Pa.Super. 480, Super.1985, appeal denied.

**12. Restitution**

Governmental entity may be victim of crime under state restitution law, and, thus, Commonwealth could be awarded restitution for salary paid to judge from date of his suspension from judicial office; Commonwealth was entitled to restitution for payment made for work not done. Com. v. O'Kicki, 597 A.2d 1258, 408 Pa.Super. 518, Super.1991, appeal denied 626 A.2d 1156, 534 Pa. 637, reconsideration denied.

## § 5302. Speculating or wagering on official action or information

A public servant commits a misdemeanor of the second degree if in contemplation of official action by himself or by a governmental



# Department of Public Safety
## BUREAU OF POLICE

**TO:**        **Inspector Strickland**

**FROM:**      **Sgt. K. Werner**   *Sgt Kw*

**DATE:**      **September 4, 2001**

**SUBJECT:**   **Officer DiLoreto**

Sir:

     This is to inform you of the follow-up on the complaint I received on September 2, 2001. After receiving the initial complaint, I was advised by Captain Van BusKirk to call Officer DiLoreto into the OIC's office when he arrived for work that evening. I was told to advise him that a verbal complaint had been filed against him, and he was to avoid any further contact with the complainant.

     That evening, along with Sgt. Liebel, Sgt. Angelotti, and Lt. Franklin, Officer Diloreto was called in to the OIC's office and advised of the complaint. He denied at the time making any traffic stops that evening. He was told that the complainant worked at Hamot Hospital and that she stated the initial contact occurred at 26th and State Streets. Officer DiLoreto did say he talked to a female at A-Plus Mini Mart at 26th and State. He was then advised again to avoid any contact with her, in person or by telephone. He stated he did not even have her telephone number. Officer DiLoreto stated he would not go near her.



## Department of Public Safety
## BUREAU OF POLICE

**TO:**       Lt. S. Franklin, Sgt. D. Angelotti, Sgt. R. Liebel

**FROM:**     Cpt. D. Van Buskirk

**DATE:**     5SEP01

**SUBJECT:**   **Request For Report**

Per Insp. Strickland, submit a report regarding the discussion with Off. DiLoreto regarding the recent allegation against him.

Be specific as to any statements he made which indicated he had knowledge of the incident you were discussing.

Submit report to Insp. Strickland ASAP.  Thanks.

Erie Police Department                                                    CD056051
7/04/01                          Radio Log Inquiry

ORI #: PA0250200 EPD          Incident #: 2001-00034827  Inc. Type: Susp Persn
Call Date . . : 09/01/2001   Call Time : 23:47:05
Dispatch Time : 23:50:00     Arrive Time:  0:02:26      Clear Time:  0:09:28
Location  . . : 2525 PEARL AV
Common Name . :
Nature of Call: W/M OLDER BUSHY HAIR FLANNEL SHIRT BOOTS

| Unit | Type | Dispatch | Arrive | Clear | Status | ID#1 | Secondary Location |
|------|------|----------|--------|-------|--------|------|--------------------|
| 3B4 | BCAR | 23:50:00 | | | Dispatch | 303 | |
| 3A2 | ACAR | 23:50:22 | | | Dispatch | 310 | |
| 3A2 | ACAR | | 0:02:26 | | Arrive | | |
| 3B4 | BCAR | | 0:02:26 | | Arrive | | |
| 3A2 | ACAR | | | 0:09:28 | Clear Call | 310 | |
| 3B4 | BCAR | | | 0:09:28 | Clear Call | 303 | |

                                                                    Bottom
  F3=Exit   F11=View2   F12=Cancel   F17=Print

DiBello confirms
that DiLoreto was
at Pearl Ave.

```
  , Police Department              Work with Cleared Calls          CD123031
    J4/01
  [ #: PA0250200 EPD
                                       Reset by Date/Time: _____ / ____
Type options, press Enter.
   2=Change  5=Display  6=Print  10=Create  11=Recall  14=Status/Disposition
   15=Vehicles  16=Names  18=Radio Log  19=Dispatch  20=Plates  24=Documents
                                                              More: + -
Opt  Date     Time   Units        Type  Location          Rpt Incident # ORI #
 __  * 09/02/01  1:56 3F1           22 P 1161 W 22 ST         N 01-00034838 PA0250200
 __  * 09/02/01  1:01 3B3           1B P 2612 PARADE ST       N 01-00034837 PA0250200
 __  * 09/02/01  0:58 3A2  K7       43A P 3/FRENCH            Y 01-00034836 PA0250200
 __  * 09/02/01  0:55 3G1           33 P 3328 EAST AV         Y 01-00034835 PA0250200
 __  * 09/02/01  0:53 3A2  3A4      17 P 1101 PARADE ST       N 01-00034834 PA0250200
 __  * 09/02/01  0:35 3Q1  K7       2 P 1035 DOWNING AV       Y 01-00034833 PA0250200
 __  * 09/02/01  0:30 K11           11 P 655 W 26 ST     UP   N 01-00034832 PA0250200
 __  * 09/02/01  0:29 3B1           33 P 232 W 25 ST          Y 01-00034831 PA0250200
 __  * 09/02/01  0:29 3G1           28 P 628 W 19 ST     DOW  Y 01-00034830 PA0250200
 __  * 09/02/01  0:10 3B3  K2       14 P 100 W 18 ST     BLK  N 01-00034829 PA0250200
 __  * 09/01/01 23:53 3G1  3A3      13 P 2015 PLUM ST    1F   Y 01-00034828 PA0250200
 __  * 09/01/01 23:47 3B4  3A2      36 P 2525 PEARL AV        N 01-00034827 PA0250200
                                                              More...

F3=Exit   F4=Prompt   F5=Refresh   F9=Resequence   F12=Cancel
```



# Department of Public Safety
## BUREAU OF POLICE

**TO:**          **Inspector Strickland**

**FROM:**        **Sgt. D.M. Angelotti**

**DATE:**        **September 6, 2001**

**SUBJECT:**     **Citizen's Complaint regarding Ptlmn. Diloreto**

On 9-2-01, Sgt. K. Werner, OIC, received a verbal complaint via phone call from a nurse at Hamot E.R. concerning the conduct of one of our officers the night before. From her description of the officer and the circumstances involved, the officer could be Greg Diloreto. At the direction of the OIC, this officer delivered a Citizen's complaint form to her at Hamot E.R..

On 9-2-01, at approx. 2230 hrs, I was in the OIC's office as Officer Diloreto was advised of the "verbal" complaint and instructed to avoid all contact with the subject involved. Sgt. Werner told him that a female had a complaint concerning a traffic stop he made last night.

Officer Diloreto stated that he didn't make any traffic stops last night. Sgt. Werner asked if he ran into a nurse from Hamot. Officer Diloreto stated that **he was approached** by a nurse while he was at the A-Plus at 26th and State. He said he didn't approach "her".

Sgt. Werner advised him to avoid all contact in person or by telephone and Officer Diloreto stated that he didn't have her number. Lt. Franklin and Sgt. Liebel were also present during this meeting.

Respectfully submitted,

Sgt. D.M. Angelotti



# Department of Public Safety
## BUREAU OF POLICE

**TO:**        **Inspector Strickland**

**FROM:**      **Sgt. R. Liebel**

**DATE:**      **September 9, 2001**

**SUBJECT:**   **Greg DiLoreto**

Sir,

In reference to this incident, I was informed by Sgt. Werner of the incident upon arriving at work that evening. I informed Sgt. Werner that when Officer DiLoreto's arrival at work, we will take him into the office and speak with him about the complaint. After taking him into the office, Sgt. Werner asked him if he had any contact with any females the previous night, he hesitated and then stated not that he could remember. He then paused and said that he had talked with a nurse from Hamot at about 2330 hrs at the A-Plus at 26th and State. Apparently she asked him to watch her car while she ran into the store which he did, she then thanked him prior to her leaving to go home. Sgt. Werner then told Officer DiLoreto of the allegations the nurse made. He said it was untrue and that she gave him her phone number after having some sort of conversation about her boyfriend wanting to become a state trooper. I then advised Officer DiLoreto to not have any contact with her at the hospital and to not make any phone calls to her at work or at her residence. I then left the room as I had to conduct roll call and they stayed in the OIC's office and continued to talk, but I was not informed what else he said. I contacted the nurse and advised her to fill out the complaint form and bring it with her to work the next day so I could pick it up, I also advised her he had been advised to stay away from her. She agreed and stated she would have it ready the next day. Upon arriving at work the next day, I was informed by Capt Vanbuskirk that they had picked up the complaint from the nurse, therefor I had no other contact with the victim.

Sincerely,

Sgt. R. Liebel



# Department of Public Safety
## BUREAU OF POLICE

**TO:**  **Insp. G. Strickland**

**FROM:**  **Lt. S. Franklin**

**DATE:**  **September 12, 2001**

**SUBJECT:**  **Allegation Against Ptlm. G. DiLoreto**

Sir;

   Regarding the above-listed subject, I was assigned to work Foot Patrol detail on Sun. 9-2-01 from 1800-2400hrs. when I was informed by OIC Sgt. Werner that an allegation had been made against Ptlm. G. DiLoreto by a private citizen. Sgt. Werner further advised me that he was going to call Ptlm. DiLoreto in at the start of his assigned shift and warn him not to have any further contact with the female citizen making the allegation until such time as it could be investigated. Sgt. Werner requested that I stand-by as a witness to this course of action. I agreed to assist him in this action.

   Upon my coming into the station at the change of shift I discovered that Sgt. Werner had already called Ptlm. DiLoreto into the OIC's office and had started advising him in the presence of Sgt. Libel. Upon my entering the office Sgt. Werner had just advised Ptlm. DiLoreto of the particulars of the allegation at which point Ptlm. DiLoreto denied the allegation as far as stopping the female who made the complaint. Sgt. Werner advised Ptlm. DiLoreto that there were two sides to every story and regardless of his side he should still avoid any contact with the complainant until the matter is resolved. Ptlm. DiLoreto then stated that the female in question approached him at the A-Plus Store at 26th & State St. and asked him for his telephone number and continued to deny that he approached her or asked her for her telephone number. I then advised Ptlm. DiLoreto to avoid the complainant until this matter is resolved and I then left the office.



# Department of Public Safety
# BUREAU OF POLICE
## Criminal Investigation Division

WAIVER FORM

Computer Voice Stress Analysis

I, _Nicole A. Aggelakos_, do hereby voluntarily, **without the use of threats or promises of any kind, submit to examination by the voice stress analysis truth verification technique. I understand that this examination may be audio and/or video taped and those recordings used for the purpose of documentation, training purposes, and/or analysis.**

Signature _Nicole Aggelakos_    Date _9/15/01_

_____/_____
(Parent or concerned adult if subject is a minor)    (Relationship to minor)

Witnessed _____

2 COPIES; ORIGINAL ATTACHED TO REPORT, COPY TO BE PLACED IN CUSA FILES.

INC. # _INTERNAL INVESTIGATION_

TEST # _449_

TAPE # _74_

STARTING TIME: _4:10 PM_

ENDING TIME: _4:58 PM_

NEW - 113
REVISED 9/15/00

# Department of Public Safety
# BUREAU OF POLICE

TO:         INSPECTOR H. G. STRICKLAND

FROM:     D/SGT KENNETH R. MERCHANT

DATE:     9-17-01

SUBJECT:  CVSA TESTING OF NICOLE AGGELAKOS

SIR,

ON 9-15-01, AS YOU REQUESTED, I ADMINISTERED A CVSA TEST ON SUBJECT NICOLE AGGELAKOS. SUBJECT DID AGREE TO TAKE THE TEST AND DID SIGN THE CVSA WAIVER FORM.

THE SCOPE OF THE TRUTH VERIFICATION EXAMINATION WAS LIMITED TO THE SUBJECT'S HONESTY AS IT RELATES TO THE ALLEGATIONS, AGAINST AN OFFICER, SHE MADE IN HER CITIZENS COMPLAINT FORM.

DURING THE PRETEST INTERVIEW, SUBJECT STATED THE SAME FACTS OF THE CASE AS SHE HAD IN THE VIDEO TAPED INTERVIEW WITH YOURSELF AND CPT. VANBUSKIRK EARLIER. SHE BASICALLY STATED THAT AT THE A PLUS STORE, A POLICE OFFICER IN UNIFORM AND AN MARKED CRUISER, WHO GAVE HIS NAME AS GREG, HAD ASKED HER TO HAVE BREAKFAST WITH HIM. HE ALSO STATED THAT HE WANTED HER TO GO TO A MORE SECLUDED AREA WITH HIM AND STATED THAT HE WOULD PULL HER OVER SO AS TO SEE HER UNDERWEAR. HE FOLLOWED HER WHEN SHE LEFT THE AREA HEADING TO THE BAYFRONT PARKWAY AND KEPT TELLING HER HE WAS GOING TO PULL HER OVER WHEN SHE GOT ONTO THE HIGHWAY AND MAKING OTHER REMARKS. SHE STATED THAT HE STOPPED FOLLOWING HER ABOUT THE TIME SHE REACHED THE CURVE ON THE BAYFRONT PARKWAY. SHE STATED THAT WHEN SHE GOT HOME, HE CALLED HER. SHE KNOWS IT WAS HIM BECAUSE HE TOLD HER IT WAS "GREG". SHE TOLD HIM TO CALL BACK AND THEN SHE AND HER BOYFRIEND LEFT THE APARTMENT. SUBJECT STATED THAT SHE DID FEEL THAT HIS ACTIONS WERE HARRASSMENT AND THAT IS WHY SHE FELT SHE SHOULD FILE THE COMPLAINT. SHE SAID SHE DID NOT EVER EXPECT A POLICE OFFICER TO ACT IN THIS MANNER.

WE THEN FORMULATED 11 QUESTIONS FOR THE GENERAL SERIES FORMAT. OF THOSE, 3 QUESTIONS WERE RELEVANT QUESTIONS. THE FOLLOWING RELEVANT QUESTIONS WERE INTERSPERSED WITH IRRELEVANT AND CONTROL QUESTIONS;

#4 - DID OFFICER GREG SAY HE WAS GOING TO PULL YOU OVER TO SEE YOUR UNDERWEAR? SUBJECT ANSWERED "YES" TO THIS QUESTION.

#6 - DID OFFICER GREG ASK YOU TO GO TO A MORE SECLUDED AREA WITH HIM ? SUBJECT ANSWERED "YES" TO THIS QUESTION.

#10 - DID OFFICER GREG CALL YOU THAT NIGHT AFTER YOU GOT HOME ?  SUBJECT ANSWERED "YES" TO THAT QUESTION.

    BASED ON MY TRAINING AND EXPERIENCE, IT IS MY OPINION THAT THE SUBJECT ANSWERED THE RELEVANT QUESTIONS TRUTHFULLY AND THE CHARTS ARE NDI, (NO DECEPTION INDICATED).
    THIS TO/FROM SUBMITTED TO YOU ALONG WITH THE ORIGINAL COPY OF THE CVSA WAIVER FORM.  A COPY OF THIS REPORT AND THE WAIVER FORM WILL BE KEPT IN THE CVSA OFFICE FILES.  THIS CVSA TEST WAS ALSO RECORDED ON CVSA INTERVIEW TAPE NUMBER 74 AND WILL ALSO BE MAINTAINED IN THE CVSA OFFICE.

                        RESPECTFULLY SUBMITTED,

# INTERNAL INVESTIGATION WARNING

**OFFICER:** __Gregory DiLoreto__                    **DATE:** __9/20/2001__

**Incident :** __Citizens Complaint of Nicole Aggelakos__

I WISH TO ADVISE YOU THAT YOU ARE BEING QUESTIONED AS PART OF AN OFFICIAL INVESTIGATION OF THE CITY OF ERIE BUREAU OF POLICE.  YOU WILL BE ASKED QUESTIONS SPECIFICALLY DIRECTED AND NARROWLY RELATED TO THE PERFORMANCE OF YOUR OFFICIAL DUTIES OR FITNESS FOR OFFICE.

YOU ARE ENTITLED TO ALL THE RIGHTS AND PRIVILEGES GUARANTEED BY THE LAWS AND THE CONSTITUTION OF THE COMMONWEALTH OF PENNSYLVANIA AND THE CONSTITUTION OF THE UNITED STATES, INCLUDING THE RIGHT NOT TO BE COMPELLED TO INCRIMINATE YOURSELF.

I FURTHER WISH TO ADVISE YOU THAT IF YOU REFUSE TO TESTIFY OR TO ANSWER QUESTIONS RELATING TO THE PERFORMANCE OF YOUR OFFICIAL DUTIES OR FITNESS FOR DUTY, YOU WILL BE SUBJECT TO DEPARTMENTAL CHARGES WHICH COULD RESULT IN YOUR DISMISSAL FROM THE ERIE BUREAU OF POLICE.  IF YOU DO ANSWER, NEITHER YOUR STATEMENTS NOR ANY EVIDENCE WHICH IS GAINED BY REASON OF SUCH STATEMENTS CAN BE USED AGAINST YOU IN ANY SUBSEQUENT CRIMINAL PROCEEDING. EXCEPT FOR PERJURY OR OBSTRUCTION OF JUSTICE.  HOWEVER, THESE STATEMENTS MAY BE USED AGAINST YOU IN SUBSEQUENT DEPARTMENTAL CHARGES.

OFFICERS ACKNOWLEDGMENT: _____ #303

WITNESS: _____    Date: 22SEP01  Time: 2235



# DEPARTMENT OF PUBLIC SAFETY
# BUREAU OF POLICE

**TO:**            **Patrolman Gregory DiLoreto**

**FROM:**         **Inspector H. G. Strickland**

**DATE:**         **Thr. 20 September 2001**

**SUBJECT:**      **Internal Investigation**

**REFERENCE:**     **Complaint of Aggelakos**

Patrolman DiLoreto:

On September 4th, 2001 a properly completed and notarized Citizen Complaint was submitted to the Bureau of Police by a Nicole Aggelakos.  In her complaint, a copy of which is attached, she alleges that on September 1st, 2001 she was subjected to unprofessional and unnecessary questions, comments, and attention by you.

The Chief of Police has ordered an administrative (non-criminal) investigation of Ms. Aggelakos complaint.

You are to complete and direct a written memo to me, in which you will respond in detail as to your recollection of your encounter with Ms. Aggelakos.  You are to address each and every statement and action attributed to you by Ms. Aggelakos.

Furthermore, neither you, nor any person(s) acting on your behalf will have, or attempt to have, any contact with either Ms. Aggelakos , her friends, family members, fellow employees, or other acquaintances during the course of this investigation.

Attachments:
1. Complaint of Nicole Aggelakos
2. Internal Investigation (Garrity) Warning



**Department of Public Safety**
**BUREAU OF POLICE**

**TO:**      INSP. STRICKLAND.

**FROM:**    PTLM. DiLORETO

**DATE:**    9-26-01

**SUBJECT:** STATEMENT CONCERNING COMPLAINT

ON THE DATE IN QUESTION I WAS APPROACHED BY YOUR COMPLAINANT WHO INITIALLY ASKED ME TO WATCH HER VEHICLE. I WAS IN MY MARKED UNIT ADDING A NARRATIVE. WHEN SHE CAME OUT OF THE STORE SHE LEANED AGAINST THE PASSENGER SIDE DOOR OF MY VEHICLE AND SAID THANK YOU AND ASKED IF I WAS CITY OR STATE POLICE. SHE ALSO MADE COMMENTS ABOUT SOMEONE SHE WAS SEEING MAKING PLANS TO TAKE A POLICE TEST — SHE WENT ON TO SAY THAT IF HE DIDN'T GO THROUGH WITH IT SHE PROBABLY WOULDN'T HAVE ANYMORE TO DO WITH HIM.

SHE SAID SHE WAS GOING HOME TO MEADVILLE TO GET CHANGED AND GO OUT AND ASKED ME WHAT TIME I GOT OFF WORK. I TOLD HER I WORK UNTIL 7 A.M. AND THEN SHE ASKED IF I HAD A CELL PHONE NUMBER. I TOLD HER I DIDN'T AND THEN SHE GAVE ME HER NUMBER. SHE ALSO SAID IT WOULD BE OK FOR ME TO CALL HER.

WE BOTH LEFT THE AREA AND AT APPROXIMATELY 4TH & STATE I NOTICED SHE WAS IN FRONT OF ME. I PULLED ALONG SIDE AND WAVED AND THAT WAS THAT.



**Department of Public Safety
BUREAU OF POLICE**

**TO:**

**FROM:**

**DATE:**            CONTINUED

**SUBJECT:**

I THEN STARTED TOWARD MY MOTHER'S RESIDENCE WHICH
IS COMMON PRACTICE UNTIL I WAS DISPATCHED TO A CALL
AND I HEADED BACK EAST.

LATER THAT NIGHT I DID CALL AND SHE ASKED ME
TO CALL BACK IN TEN MINUTES. WHEN I CALLED BACK
THERE WAS NO ANSWER, I LEFT A BRIEF MESSAGE AND
THAT WAS THE ABSOLUTE END OF IT. I NEVER CALLED
AGAIN.



# Department of Public Safety
## BUREAU OF POLICE

**TO:** INSP STRICKLAND

**FROM:** PTLM. DILORETO

**DATE:** 9-27-01

**SUBJECT:** RESPONSE TO COMPLAINT (CONTINUATION)

IT IS MY UNDERSTANDING THAT AS THIS IS A CONTINUATION OF MY LAST STATEMENT THAT THE GARRITY RULE IS STILL IN EFFECT.

WHEN THE COMPLAINANT SAID SHE WAS GOING TO GO OUT THAT NIGHT SHE STATED SOMETHING TO THE EFFECT THAT SHE WAS GOING TO CHANGE CLOTHES AND I ASKED WHAT WOULD BE "GOING OUT" CLOTHING IN MEADVILLE. SHE SAID, AS I RECALL, SOME "CUTE JEANS" AND SOME KIND OF TOP. THE ENTIRE CONVERSATION WAS LIGHT HEARTED IN NATURE. I BELIEVE I COMMENTED THAT THE NEW STYLE LOW CUT JEANS LOOKED SEXY WITH THE RIGHT UNDERWEAR. SHE THEN SAID THAT SHE ALWAYS WEARS "SEXY PANTIES" AND THAT SHE WAS WEARING SEXY PANTIES AT THAT MOMENT AND IF I CALLED HER AND CAME TO MEADVILLE THE NEXT DAY THAT I COULD SEE THEM THEN. I SAID THAT IF SHE KEPT TALKING LIKE THAT SHE WAS GOING TO MAKE ME COME DOWN TO MEADVILLE THAT NIGHT, WHICH I KNEW I COULDN'T AND WOULDN'T. SHE EVEN ASKED ME IF I COULD AND I SAID NO.



**Department of Public Safety**
**BUREAU OF POLICE**

**TO:**

**FROM:**

**DATE:**                    CONTINUED

**SUBJECT:**

I FELT LIKE SHE WAS PROBABLY JUST TEASING ME AND AFTER CALLING AND GETTING NO ANSWER THAT NIGHT I GUESSED THAT I WAS CORRECT AND MADE NO FURTHER ATTEMPT TO CONTACT HER FIGURING SHE HAD HER FUN AT MY EXPENSE AND THAT WOULD BE THE END OF IT.

I DIDN'T SUGGEST THAT WE MEET IN A SECLUDED PLACE I ONLY SAID THAT IF SHE WANTED TO TALK MORE THAT WE COULD GET SOMETHING TO EAT AS FOOT TRAFFIC WAS HEAVY IN FRONT OF THE STORE.



# DEPARTMENT OF PUBLIC SAFETY
# BUREAU OF POLICE

**TO:**       **Captain  David Van Buskirk**

**FROM:**     **Inspector H. G. Strickland**

**DATE:**     **Thr 27 September 2001**

**SUBJECT:**  **Ptl. G. DiLoreto**

**REFERENCE:**  **Citizens Complaint of Nicole Aggelakos**

---

On this date a written response to the complaint of Ms. Aggelakos was received
from Ptl. DiLoreto.  In his Memo he basically, but not specifically, denies the
allegations of Ms. Aggelakos.  In view of this, I request that you conduct a direct
interview with DiLoreto and ask him the below listed specific questions.

1.    When speaking with Ms. Aggelakos, did you tell her that you would, or may
      pull her over, so you could see her underwear?

2.    Did you ask or suggest to Ms. Aggelakos that she should meet you in a more
      secluded location while you were on duty?

Should DiLoreto's response be anything other than "NO" to either of these
questions, have him explain (verbally and in writing ) as to his recollection of what
he did say to Ms. Aggelakos.

In addition, should DiLoreto respond in any fashion, other than to admit to having
made these comments to Ms. Aggelakos, ask him if he would voluntarily submit to a
C.V.S.A. (Computer Voice Stress Analyzer) or polygraph examination.  You may
inform DiLoreto that a C.V.S.A. examination was administered to Ms. Aggelakos,
and that she was found to be truthful.

Attachments:    Copy of Ms. Aggelakos Complaint
                Copy of DiLoreto's response Memo



# Department of Public Safety
# BUREAU OF POLICE

**TO:**           **Inspector G. Strickland**

**FROM:**       **Capt. T. Adams**

**DATE:**       **September 28, 2001**

**SUBJECT:**     **Ofc. G. DiLoreto  Response**

Sir,

Ofc. G. DiLoreto responded to the first question with just a no answer. The second question, he became a little more verbal, responding that that broad came on to him while he was sitting there doing a report, and that there were other people around she could have had watch her car. What he should do is file a complaint with Hamot against her.

I told Ofc. G. DiLoreto to write another memo to you answering these questions that were asked, and asked him if he would submit to a polygraph or voice stress analyzer examination. He became more upset, and said that if the City was coming after him to bring it on with he and his lawyer. He said that anymore of these questions he wanted his lawyer and his FOP representative with him.

When beginning the interview I told him that the questions were not for any criminal prosicution, and that they were just questions that needed to be clarified as they were not covered in his first memo.  He was also told before asking about the voice stress analyzer or polygraph that the origional complaintant had taken one and appeared to be truthfull. Ofc. G. DiLoreto's  appearance when told of the truthfullness of the complaintant , seemed  to change momentarily to open mouthed, and the color seemed to have momentarily drained from his face. His demeanor became once again angry shortly there after.