E

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   JENNIFER RAE GEORGE, an      :   Civil Action - Law
     incapacitated person, by     :
 4   RAYMOND G. GEORGE and        :
     SUSAN M. GEORGE, Guardians,  :
 5           Plaintiffs           :
                                  :
 6             v.                 :   Case No. 04-77E
                                  :
 7   CITY OF ERIE, JOYCE          :
     SAVACCHIO, PAUL DEDIONISIO,  :
 8   RICHARD SZYCHOWSKI, DAVID    :
     VAN BUSKIRK, RICHARD         :
 9   CRAWFORD, PATRICK DURKIN,    :
     GREGORY T. DiLORETO and      :
10   JOHN DOE,                    :
             Defendants           :
11

12          Deposition of JOHN BENEDICT, taken before and
     by Carol A. Holdnack, RPR, Notary Public in and for
13   the Commonwealth of Pennsylvania, on Tuesday,
     November 9, 2004, commencing at 1:02 p.m., at the
14   offices of Marshall Dennehey Warner Coleman & Goggin,
     Renaissance Centre, 1001 State Street, Suite 1400,
15   Erie, PA 16501.

16   For the Plaintiffs:
         Alan Natalie, Esquire
17       504 State Street, Suite 300
         Erie, PA 16501
18
     For Defendant City of Erie:
19       Patrick M. Carey, Esquire
         Marshall Dennehey Warner Coleman & Goggin
20       1001 State Street, Suite 1400
         Erie, PA 16501
21
     For Defendant Gregory T. DiLoreto:
22       David L. Haber, Esquire
         Weinheimer Schadel & Haber
23       602 Law & Finance Building
         429 Fourth Avenue
24       Pittsburgh, PA 15219

25           Reported by Carol A. Holdnack, RPR
           Ferguson & Holdnack Reporting, Inc.
```

I N D E X

JOHN BENEDICT

    Direct Examination by Mr. Carey . . . . . . 3

    Cross-Examination by Mr. Natalie . . . . . 12

1      J O H N   B E N E D I C T, first having

2      been duly sworn, testified as follows:

3

4                      DIRECT EXAMINATION

5   BY MR. CAREY:

6

7      Q.    Would you please state your name.

8      A.    John Benedict.

9      Q.    Okay.  You go by Jack?

10      A.    Yeah, I go by Jack.

11      Q.    My name is Pat Carey.  We talked last week, and

12   then I scheduled your deposition today.  Have you ever had

13   your deposition taken?

14      A.    No.

15      Q.    As I explained to you last week, it's merely a

16   questioning session where we ask you questions about

17   yourself and about information that you may have relative to

18   this case.  And if you have answers, you can provide them to

19   us.

20          We do have a court reporter here taking everything

21   down.  So I would ask that all of your responses be verbal.

22   In other words, don't say um-hum or hum-um, say yes or no,

23   and make all your responses out loud.  You are under oath as

24   you would be if you testified in court.  I just point that

25   out to you as well.

1           When we're done here, there will be a transcript

2    prepared of your testimony.  And so, therefore, in order

3    that we get a good, clean transcript that we can read,

4    please make your responses verbal.  Try not to answer my

5    question before I'm done asking it.  And I'll try not to ask

6    the next question while you're still answering the previous

7    one.  Okay?

8           A.    Okay.

9           Q.    If at any time -- this won't be long.  But if at

10   any time you need a break, you let me know that too, and

11   we'll accommodate you.

12          A.    Okay.

13          Q.    Mr. Benedict, where do you work?

14          A.    City of Erie streets department.

15          Q.    How long have you worked there?

16          A.    A little over 14 years.

17          Q.    How old are you?

18          A.    38.

19          Q.    How far did you go in school?

20          A.    Graduated, 12th grade.

21          Q.    What school?

22          A.    East High.

23          Q.    What year?

24          A.    1984.

25          Q.    What do you do for the streets department?

4

1     A.   Heavy equipment operator.

2     Q.   I should have probably started off with this.  But

3 as I told you last week, this case involves an automobile

4 accident that occurred at 14th and Parade Streets.  Jennifer

5 George was involved in an accident with a City of Erie

6 police cruiser.  And I represent the City of Erie in this

7 case.  Jennifer, through her parents, has brought a lawsuit.

8 Do you know Jennifer George?

9     A.   Yes, I do.

10    Q.   How long have you known her?

11    A.   She's my cousin.

12    Q.   Okay.  Do you know, is she a first cousin, second

13 cousin?

14    A.   I would -- I'm not sure.

15    Q.   Do you know her parents?

16    A.   Yes.

17    Q.   Did you grow up knowing Jennifer and her parents?

18 I mean, are you close?

19    A.   I would see them a couple times a year.  But other

20 than that, that would it be it, just a couple times a year.

21    Q.   Do you know Greg DiLoreto?

22    A.   No.  I'm not sure if I know him or not.  If I seen

23 his face, I might know him.

24    Q.   He was a former City police officer.  He was

25 involved in this accident.  Does that help?

1      A.    Well, yeah, I know that part.  But, I mean, by

2   seeing him on the street, I don't know if I would be able to

3   tell you I know him, you know, unless I seen him.

4      Q.    You might recognize his face, but you can't put a

5   face --

6      A.    With the name.

7      Q.    -- with a name right now?

8      A.    Yeah.

9      Q.    Up at the streets department, where is that

10  located, first of all?

11     A.    20th and French.

12     Q.    Up at the streets department, do City of Erie

13  police officers ever go up there with their cruisers?

14     A.    Yes.  They get fuel, and use the bathroom, and get

15  air in the tires.  Plus the garage is -- municipal garage is

16  across the street, for mechanical work.

17     Q.    So the police cruisers are maintained at that

18  location?

19     A.    As far as I know, yes.

20     Q.    Is that the basis of why you may recognize his

21  face if you saw him, if somebody pointed out to you and

22  said, this is Greg DiLoreto, is that why you might know his

23  face, because he may have had the cruiser up at the streets

24  department?

25     A.    It might be.  I don't know him personally.

1      Q.   Okay.  You've been identified as -- through

2   discovery in this case, as someone who may know something

3   about Mr. DiLoreto's reputation with respect to driving.

4   Were you aware of that?

5      A.   You're talking about what happened, like -- I know

6   that they -- from his reputation, what I heard, that they

7   would call him NASCAR.  And he would do burnouts.  And his

8   partners -- some of his partners didn't want to be with him.

9   I just heard that, from everybody talking.

10     Q.   Can you identify anybody who told you that?

11     A.   No.  It could have been Duck.  I'm not sure.  I

12  don't want to say.  I'm not sure.  It's been like two years

13  ago.

14     Q.   Okay.  When you say Duck, who is that?

15     A.   Or Don, Donald.

16     Q.   Marofsky?

17     A.   Marofsky, yes.

18     Q.   And do you work with him?

19     A.   Yes, I do.

20     Q.   So you're saying that he may have been the one who

21  told you that?

22     A.   He could have been.  I heard it from other people

23  too, you know, if it wasn't from him.  I can't remember

24  because it's been two years ago or so, or longer.

25     Q.   Can you recall the identity of anybody else other

7

1    than Don Marofsky who may have told that you?

2         A.   No.  And I'm not even positive if Donny did.  But

3    I'm just saying he could have, because I know he knows my

4    cousin.  And me and him were talking about the accident

5    after it happened.  But I couldn't tell you for sure if he

6    told me any of that stuff or not.

7         Q.   Well, let's talk about this.  How did you find out

8    about this accident?

9         A.   I seen it on the news.

10        Q.   And when you saw it on the news, did you know at

11   that time that it involved Jennifer?

12        A.   Yes.

13        Q.   Okay.  Would you have heard about this within a

14   day or so of the accident?

15        A.   Most likely, through family, I probably would

16   have.

17        Q.   After you found out about this accident, did you

18   have any contact with Jennifer's parents?

19        A.   I want to say it was around Eastertime when it

20   happened.  April, I think, it might have been.

21        Q.   Okay.

22        A.   I was at fishing camp.  So when -- the day it

23   happened, we were watching TV, and we seen it on the news

24   there.  And I got back.  I don't know if I got back Saturday

25   or Sunday after I heard about it.  And then I went to the

1    hospital to see her.  And I talked to her mom at the

2    hospital.  That was it.

3        Q.   Did her mother tell you how the accident happened?

4    Did she provide you with any information?

5        A.   I can't be sure if she did or not.  I mean, she

6    probably told me how it happened or whatever.  But I'm not

7    positive.  I'm -- she could have told me that the cop hit

8    her, you know, it was a cop that hit her, because I work for

9    the City.  She might have told me that, but I'm not

10   positive.

11       Q.   When you had that specific conversation with

12   Jennifer's mother, did you tell her at that time that this

13   police officer had a reputation, was called NASCAR, et

14   cetera, et cetera?

15       A.   I can't be sure, because I don't know if I was

16   back to work before I talked to her, or if I went back to

17   work after I talked to her and heard about it.  So I'm not

18   positive.

19       Q.   Let me narrow this down a little bit.  You told me

20   a minute ago -- and correct me if I mischaracterize this.

21   You told me a minute ago that you had heard from people, you

22   can't recall who, that DiLoreto had a nickname of NASCAR

23   and/or was known to do burnouts, et cetera, et cetera?

24       A.   I heard that while I was at work.

25       Q.   Did you hear that type of information before this

9

1    accident occurred or after this accident occurred?

2        A.   After the accident.

3        Q.   Okay.

4        A.   I know that for sure.  Because I don't really

5    think I knew the guy before that happened.  And then once

6    everybody found out it was my cousin -- or it could have

7    happened before they found out it was my cousin.  But it was

8    after the accident that I heard that they had nicknamed him

9    NASCAR and all the other stuff.

10       Q.   Okay.  You said a couple minutes ago too that you

11   heard that police officers did not want to ride with

12   DiLoreto.

13       A.   Yes.

14       Q.   Do you recall who may have told you that?

15       A.   No.  It's -- I don't know when -- at the time it

16   happened, everybody was talking about it.  And I just

17   overheard them -- or they were telling me.  I can't remember

18   who was saying it.

19       Q.   Okay.  So this is just scuttlebutt that you're

20   hearing up at the City streets department?

21       A.   Most likely, yeah.  They were just saying about

22   his reputation.  I had no idea if it's true or not.

23       Q.   Okay.  As we sit here, are you able to tell me

24   whether you've ever seen Officer DiLoreto driving the

25   cruiser?

1        A.    I'm not sure what he looks like, so I don't know

2    if I can -- I mean, if I seen him, I could probably tell you

3    yes or no.   But to put his name with his face, I'm almost

4    positive I couldn't do it.

5        Q.    Let me ask you this.   Are you aware of whether or

6    not police officers are assigned to certain police vehicles,

7    in other words, Police Officer Smith is assigned to Alpha 1,

8    or anything like that?

9        A.    I know they have different squads or platoons,

10   whatever you want to call it.   And I'm not sure if they have

11   the same cars or not.

12       Q.    Do you have any information about Officer DiLoreto

13   driving a particular car that helps you remember who this

14   particular officer is?

15       A.    No.   Because I don't know -- I'm almost positive I

16   don't know what he looks like, so.

17       Q.    Did you -- and if I asked you this, I apologize, I

18   don't mean to ask things more than once.   Did you ever tell

19   Jennifer's parents, either her mother or her father, about

20   what you heard about DiLoreto?

21       A.    Yes, I think I did.   I was telling -- I think I

22   told Susie.

23       Q.    That would be Jennifer's mother?

24       A.    Mother, yes.   I was just telling her about the

25   reputation I heard.   I said, I don't know if it's true or

1  not.

2      Q.    Did you ever speak to any person who identified

3  themselves as an investigator hired by any of the attorneys

4  in this case?

5      A.    No.  Well, just you, the other day.

6      Q.    Just last week.

7      A.    Last week.

8      Q.    Wednesday or whatever that was.

9      A.    Yeah, Wednesday or Thursday.

10     Q.    Have you ever talked to Attorney Natalie about

11  this case?

12     A.    No.

13          MR. CAREY:  I probably don't have any more

14          questions for you, but these other attorneys may.

15          MR. HABER:  I don't have any questions.

16

17                    CROSS-EXAMINATION

18  BY MR. NATALIE:

19

20     Q.    Mr. Benedict, I'm Alan Natalie.  I represent the

21  George family in this matter.  Let me try to put in context

22  your hearing of Mr. DiLoreto's reputation.  Was the

23  happening of the accident something that prompted people to,

24  in the police department and at the streets department, to

25  talk about DiLoreto's reputation?

1          MR. HABER:  I'm going to object to the form of the

2          question.  I don't think he's capable of answering

3          what prompted other people to do things.

4     Q.   Well, was it the happening of the accident that

5     was part of discussions that led to the sharing of that

6     reputation information with you?

7     A.   I know the time of the accident happening, being

8     that it was my cousin, I went over to the garage and looked

9     at the police car and the truck.  And everybody there was

10    talking.  And I said, yeah, that's my cousin.  And after

11    that, I heard about being called NASCAR and was --

12    reputation of doing burnouts and all that.

13    Q.   Was this information that people were sharing with

14    you, did that come from within police ranks?

15    A.   No police officers were involved.  It was just

16    blue collar workers.  It was either from the streets

17    department or municipal garage, is where I was hearing it

18    from.

19    Q.   But they related information to you, or shared

20    information with you, about officers refusing to ride with

21    him?

22    A.   Yes, I heard that.

23    Q.   You heard that?

24    A.   Yes.

25    Q.   And your understanding was that that came from

13

1    officers within the ranks?

2         A.    You mean like coming from the police officers?

3         Q.    Yes.

4         A.    No, I didn't hear it from no police officer.

5         Q.    I mean, how did these people that did share this

6    information with you come to hear this?

7         A.    I guess just from working at the City.  Like the

8    mechanics, they know all the cops because they work on the

9    cars.  And guys in our department, streets department, they

10   pump their gas and do flat tires and that.

11        Q.    But, I mean, the ultimate source of that

12   information would come from officers sharing their feelings

13   with those types of people?

14        A.    I don't know.

15        Q.    And then those people sharing --

16        A.    I couldn't tell that you.

17        Q.    All right.  I guess what I'm trying to get at --

18        A.    I don't know if they did or if officers told them

19   that or what.  I have no idea.

20        Q.    So these coworkers of yours in the streets

21   department and the municipal garage were telling you things

22   about what they heard about DiLoreto, things like burnouts.

23        A.    Yes, that's where I heard it from, is the other

24   blue collar workers.

25        Q.    His nickname being NASCAR.

1     A.   Yes.

2     Q.   And that other officers didn't want to ride with

3 him.

4     A.   Yes.

5     Q.   Did you happen to speak with any of the

6 investigators following this accident?  I mean --

7     A.   No.

8     Q.   Did you see anyone inspecting the vehicles,

9 anything like that?

10    A.   Calvin.  I don't know what his first name is.

11    Q.   Carl Colm (phonetic)?

12    A.   Calvin, they call him.  He's over in the municipal

13 garage.  I forgot about that.

14    Q.   What's his name?

15    A.   Calvin, yes.

16    Q.   He's a garage employee?

17    A.   Yes, he is.

18    Q.   What did he -- what was his involvement?

19    A.   I heard he was -- because he's one of the

20 mechanics.  He wasn't allowed to inspect the car or the

21 truck because -- I guess he's related to my cousin.  His

22 sister married my cousin, which is his sister.  Or somehow

23 he's related to me.

24       MR. CAREY:  You lost me.

25    A.   I forgot about it.  I don't want to get in

1    trouble.

2        Q.    So these two vehicles were impounded at the

3    municipal garage for some period of time?

4        A.    I know the truck was for sure.

5        Q.    You saw the cruiser there as well?

6        A.    I think I saw the cruiser.    I'm almost positive

7    the cruiser was there.

8        Q.    And only certain individuals were allowed to

9    inspect the vehicles?

10       A.    Well, I know that Calvin wasn't allowed because he

11   was related somehow.    But I don't know who inspected it.    I

12   know they were having some investigators come down and have

13   them take a look at the truck.    I just went over just to

14   more or less be nosey to see how bad the truck was.

15       Q.    Is that the first time you ever saw a damaged

16   police cruiser at the municipal garage?

17       A.    No.

18       Q.    How many times before that could you estimate

19   you've seen that occur?    Is that -- first of all, is that

20   where they go, typically?

21       A.    I don't know if they go there.    I know some come

22   there.    I don't know if they have other places where they

23   take them.    But I did see other cruisers damaged.    I

24   couldn't tell you how many.

25       Q.    Okay.    Anyone ever share information with you

1    about how that came to be, how Erie police cruisers got

2    damaged?

3        A.    No.

4            MR. CAREY:    You don't mean this cruiser, you mean

5            just in general?

6        Q.    Others.

7        A.    No.

8        Q.    Did you ever hear about prior motor vehicle

9    accidents with police officers involving police cruisers,

10   did you ever hear about that at work?

11       A.    No.

12       Q.    What do you do at the streets department?

13       A.    Heavy equipment operator.

14       Q.    All right.  So like backhoes and things like that?

15       A.    Backhoes, and run the roller, highlifts, dozer,

16   paving machine.

17       Q.    So if they're paving streets or ripping up

18   streets, that kind of thing, you're involved in that.

19       A.    Yes.  Snow plowing.

20       Q.    So you don't have personal involvement in the

21   maintenance or repair of police cruisers?

22       A.    No.  They take care of that across the street --

23   or across the parking lot at the municipal garage.  As far

24   as I know, they do that, repair them over there.

25       Q.    Has anyone from the City of Erie other than Mr.

1    Carey's call to you last week contacted you about any

2    knowledge you may have about Mr. DiLoreto, Jennifer George,

3    or anything about this case?

4         A.    No.

5         Q.    All right.  What did you discuss with Mr. Carey,

6    anything?

7         A.    He just basically asked me some of the same

8    questions that he asked me today.  Asked how I heard about

9    it, and if I knew Mr. DiLoreto.

10        Q.    All right.

11        A.    Stuff like that.  Basically, it was almost the

12   same thing he asked me today.

13        Q.    All right.  Has any investigator from the police

14   department or its -- or the City's insurance company ever

15   contacted you?

16        A.    No.

17             MR. NATALIE:  That's all I have.

18             MR. CAREY:  I don't have anything further.

19             MR. HABER:  No

20             MR. CAREY:  You're done.

21             THE WITNESS:  Okay.

22             MR. CAREY:  She is going to prepare a transcript

23             from your testimony today.  And you have the right

24             to review it and make any corrections you think

25             are appropriate.  You can also waive that right

18

1        and just let her prepare it.  It's your choice.

2        THE WITNESS:  Well, I got nothing to hide, so as

3        long as it's everything we talked about.

4        MR. CAREY:  It's going to be every word.

5        THE WITNESS:  Okay.

6        MR. CAREY:  You waive your right to review it?

7        THE WITNESS:  No, can I review it?  I would

8        like --

9        MR. CAREY:  If you want -- that's up to you.

10       THE WITNESS:  I'll take a look at it.

11       MR. CAREY:  Do we have your address here?

12       THE WITNESS:  2814 Tuttle Avenue.

13       MR. CAREY:  What's the Zip?

14       THE WITNESS:  16504.

15

16       (Deposition concluded at 1:21 p.m.)

17

18

19

20

21

22

23

24

25

1

2

3                       C E R T I F I C A T I O N

4

5        I, Carol A. Holdnack, a Court Reporter and

6   Notary Public in and for the Commonwealth of

7   Pennsylvania, do hereby certify that the foregoing

8   is a true and accurate transcript of my

9   stenographic notes in the above-captioned matter.

10

11

12

13   _____

14            Registered Professional Reporter

15

16

17   Dated:_____11-23-04_____

18

19

20

21

22

23

24

25

George v. City of Erie, et al.

John Benedict

### A

able 6:2 10:23
about 3:16,17 7:3,5
  8:4,7,8,13,17,25
  9:17 10:16,21
  11:12,19,20,24
  12:10,25 13:11,20
  14:22,22 15:13,25
  17:1,8,10 18:1,2,3
  18:8 19:3
accident 5:4,5,25
  8:4,8,14,17 9:3
  10:1,1,2,8 12:23
  13:4,7 15:6
accidents 17:9
accommodate 4:11
across 6:16 17:22
  17:23
Action 1:3
address 19:11
after 8:5,17,25 9:17
  10:1,2,8 13:10
ago 7:13,24 9:20,21
  10:10
air 6:15
Alan 1:16 12:20
allowed 15:20 16:8
  16:10
almost 11:3,15 16:6
  18:11
Alpha 11:7
and/or 9:23
answer 4:4
answering 4:6 13:2
answers 3:18
anybody 7:10,25
anyone 15:8 16:25
  17:25
anything 11:8 15:9
  18:3,6,18
apologize 11:17
appropriate 18:25
April 8:20
around 8:19
asked 11:17 18:7,8
  18:8,12
asking 4:5
assigned 11:6,7
Attorney 12:10
attorneys 12:3,14
automobile 5:3
Avenue 1:23 19:12
aware 7:4 11:5

### B

B 3:1
back 8:24,24 9:16

9:16
backhoes 17:14,15
bad 16:14
basically 18:7,11
basis 6:20
bathroom 6:14
before 1:12 4:5
  9:16,25 10:5,7
  16:18
being 13:7,11 14:25
Benedict 1:12 2:3
  3:8 4:13 12:20
bit 9:19
blue 13:16 14:24
break 4:10
brought 5:7
Building 1:23
burnouts 7:7 9:23
  13:12 14:22
BUSKIRK 1:8

### C

C 3:1
call 7:7 11:10 15:12
  18:1
called 9:13 13:11
Calvin 15:10,12,15
  16:10
came 13:25 17:1
camp 8:22
capable 13:4
car 11:13 13:9
  15:20
care 17:22
Carey 1:19 2:4 3:5
  3:11 12:13 15:24
  17:4 18:5,18,20
  18:22 19:4,6,9,11
  19:13
Carey's 18:1
Carl 15:11
Carol 1:12,25
cars 11:11 14:9
case 1:6 3:18 5:3,7
  7:2 12:4,11 18:3
Centre 1:14
certain 11:6 16:8
cetera 9:14,14,23
  9:23
choice 19:1
City 1:7,18 4:14 5:5
  5:6,24 6:12 9:9
  10:20 14:7 17:25
City's 18:14
Civil 1:3
clean 4:3
close 5:18

Coleman 1:14,19
collar 13:16 14:24
Colm 15:11
come 13:14 14:6,12
  16:12,21
coming 14:2
commencing 1:13
Commonwealth
  1:13
company 18:14
concluded 19:16
contact 8:18
contacted 18:1,15
context 12:21
conversation 9:11
cop 9:7,8
cops 14:8
correct 9:20
corrections 18:24
couple 5:19,20
  10:10
court 1:1 3:20,24
cousin 5:11,12,13
  8:4 10:6,7 13:8,10
  15:21,22
coworkers 14:20
CRAWFORD 1:9
Cross-Examination
  2:5 12:17
cruiser 5:6 6:23
  10:25 16:5,6,7,16
  17:4
cruisers 6:13,17
  16:23 17:1,9,21

### D

D 2:1 3:1
damaged 16:15,23
  17:2
David 1:8,22
day 8:14,22 12:5
DEDIONISIO 1:7
Defendant 1:18,21
Defendants 1:10
Dennehey 1:14,19
department 4:14,25
  6:9,12,24 10:20
  12:24,24 13:17
  14:9,9,21 17:12
  18:14
deposition 1:12
  3:12,13 19:16
different 11:9
DiLoreto 1:9,21
  5:21 6:22 9:22
  10:12,24 11:12,20
  14:22 18:2,9

DiLoreto's 7:3
  12:22,25
Direct 2:4 3:4
discovery 7:2
discuss 18:5
discussions 13:5
DISTRICT 1:1,1
DOE 1:10
doing 13:12
Don 7:15 8:1
Donald 7:15
done 4:1,5 18:20
Donny 8:2
down 3:21 9:19
  16:12
dozer 17:15
driving 7:3 10:24
  11:13
Duck 7:11,14
duly 3:2
DURKIN 1:9

### E

E 2:1 3:1,1
East 4:22
Eastertime 8:19
either 11:19 13:16
employee 15:16
equipment 5:1
  17:13
Erie 1:7,15,17,18
  1:20 4:14 5:5,6
  6:12 17:1,25
Esquire 1:16,19,22
estimate 16:18
et 9:13,14,23,23
even 8:2
ever 3:12 6:13
  10:24 11:18 12:2
  12:10 16:15,25
  17:8,10 18:14
every 19:4
everybody 7:9 10:6
  10:16 13:9
everything 3:20
  19:3
Examination 2:4
  3:4
explained 3:15

### F

face 5:23 6:4,5,21
  6:23 11:3
family 8:15 12:21
far 4:19 6:19 17:23
father 11:19
feelings 14:12

DiLoreto's 7:3
  12:22,25
Ferguson 1:25
Finance 1:23
find 8:7
first 3:1 5:12 6:10
  15:10 16:15,19
fishing 8:22
flat 14:10
following 15:6
follows 3:2
forgot 15:13,25
form 13:1
former 5:24
found 8:17 10:6,7
Fourth 1:23
French 6:11
from 7:6,9,22,23
  9:21 13:14,16,18
  13:25 14:2,4,7,12
  14:23 17:25 18:13
  18:23
fuel 6:14
further 18:18

### G

G 1:4
garage 6:15,15 13:8
  13:17 14:21 15:13
  15:16 16:3,16
  17:23
gas 14:10
general 17:5
George 1:3,4,4 5:5
  5:8 12:21 18:2
go 3:9,10 4:19 6:13
  16:20,21
Goggin 1:14,19
going 13:1 18:22
  19:4
good 4:3
grade 4:20
Graduated 4:20
Greg 5:21 6:22
Gregory 1:9,21
grow 5:17
Guardians 1:4
guess 14:7,17 15:21
guy 10:5
guys 14:9

### H

H 3:1
Haber 1:22,22
  12:15 13:1 18:19
happen 15:5
happened 7:5 8:5
  8:20,23 9:3,6 10:5
  10:7,16

George v. City of Erie, et al.

John Benedict

Page 2

**happening** 12:23
13:4,7
**having** 3:1 16:12
**hear** 9:25 14:4,6
17:8,10
**heard** 7:6,9,22 8:13
8:25 9:17,21,24
10:8,11 11:20,25
13:11,22,23 14:22
14:23 15:19 18:8
**hearing** 10:20
12:22 13:17
**Heavy** 5:1 17:13
**help** 5:25
**helps** 11:13
**her** 5:7,10,15,17 9:1
9:1,3,8,8,12,16,17
11:19,19,24 19:1
**hide** 19:2
**High** 4:22
**highlifts** 17:15
**him** 5:22,23 6:2,3,3
6:21,25 7:7,8,18
7:23 8:4 10:8
11:2 13:21 15:3
15:12
**hired** 12:3
**hit** 9:7,8
**Holdnack** 1:12,25
1:25
**hospital** 9:1,2
**hum-um** 3:22

**I**

**idea** 10:22 14:19
**identified** 7:1 12:2
**identify** 7:10
**identity** 7:25
**impounded** 16:2
**Inc** 1:25
**incapacitated** 1:3
**individuals** 16:8
**information** 3:17
9:4,25 11:12 13:6
13:13,19,20 14:6
14:12 16:25
**inspect** 15:20 16:9
**inspected** 16:11
**inspecting** 15:8
**insurance** 18:14
**investigator** 12:3
18:13
**investigators** 15:6
16:12
**involved** 5:5,25
8:11 13:15 17:18
**involvement** 15:18

17:20
**involves** 5:3
**involving** 17:9

**J**

**J** 3:1
**Jack** 3:9,10
**Jennifer** 1:3 5:4,7,8
5:17 8:11 18:2
**Jennifer's** 8:18 9:12
11:19,23
**John** 1:10,12 2:3
3:8
**JOYCE** 1:7
**just** 3:24 5:20 7:9
8:3 10:16,19,21
11:24 12:5,6
13:15 14:7 16:13
16:13 17:5 18:7
19:1

**K**

**kind** 17:18
**knew** 10:5 18:9
**know** 4:10 5:8,12
5:15,21,22,23 6:1
6:2,3,3,19,22,25
7:2,5,23 8:3,10,24
9:8,15 10:4,15
11:1,9,15,16,25
13:7 14:8,14,18
15:10 16:4,10,11
16:12,21,21,22
17:24
**knowing** 5:17
**knowledge** 18:2
**known** 5:10 9:23
**knows** 8:3

**L**

**L** 1:22
**last** 3:11,15 5:3
12:6,7 18:1
**Law** 1:3,23
**lawsuit** 5:7
**led** 13:5
**less** 16:14
**let** 4:10 9:19 11:5
12:21 19:1
**let's** 8:7
**like** 7:5,12 11:1,8
11:16 14:2,7,22
15:9 17:14,14
18:11 19:8
**likely** 8:15 10:21
**little** 4:16 9:19
**located** 6:10

**location** 6:18
**long** 4:9,15 5:10
19:3
**longer** 7:24
**look** 16:13 19:10
**looked** 13:8
**looks** 11:1,16
**lost** 15:24
**lot** 17:23
**loud** 3:23

**M**

**M** 1:4,19
**machine** 17:16
**maintained** 6:17
**maintenance** 17:21
**make** 3:23 4:4
18:24
**many** 16:18,24
**Marofsky** 7:16,17
8:1
**married** 15:22
**Marshall** 1:14,19
**matter** 12:21
**may** 3:17 6:20,23
7:2,20 8:1 10:14
12:14 18:2
**mean** 5:18 6:1 9:5
11:2,18 14:2,5,11
15:6 17:4,4
**mechanical** 6:16
**mechanics** 14:8
15:20
**merely** 3:15
**might** 5:23 6:4,22
6:25 8:20 9:9
**minute** 9:20,21
**minutes** 10:10
**mischaracterize**
9:20
**mom** 9:1
**more** 11:18 12:13
16:14
**Most** 8:15 10:21
**mother** 9:3,12
11:19,23,24
**motor** 17:8
**municipal** 6:15
13:17 14:21 15:12
16:3,16 17:23

**N**

**N** 2:1 3:1,1
**name** 3:7,11 6:6,7
11:3 15:10,14
**narrow** 9:19
**NASCAR** 7:7 9:13

9:22 10:9 13:11
14:25
**Natalie** 1:16 2:5
12:10,18,20 18:17
**need** 4:10
**news** 8:9,10,23
**next** 4:6
**nickname** 9:22
14:25
**nicknamed** 10:8
**nosey** 16:14
**Notary** 1:12
**nothing** 19:2
**November** 1:13

**O**

**O** 3:1
**oath** 3:23
**object** 13:1
**occur** 16:19
**occurred** 5:4 10:1,1
**off** 5:2
**officer** 5:24 9:13
10:24 11:7,12,14
14:4
**officers** 6:13 10:11
11:6 13:15,20
14:1,2,12,18 15:2
17:9
**offices** 1:14
**Okay** 3:9 4:7,8,12
5:12 7:1,14 8:13
8:21 10:3,10,19
10:23 16:25 18:21
19:5
**old** 4:17
**once** 10:5 11:18
**one** 4:7 7:20 15:19
**only** 16:8
**operator** 5:1 17:13
**order** 4:2
**other** 3:22 5:19
7:22,25 10:9 11:7
12:5,14 13:3
14:23 15:2 16:22
16:23 17:25
**Others** 17:6
**out** 3:23,25 6:21 8:7
8:17 10:6,7
**over** 4:16 13:8
15:12 16:13 17:24
**overheard** 10:17

**P**

**PA** 1:15,17,20,24
**Parade** 5:4
**parents** 5:7,15,17

8:18 11:19
**parking** 17:23
**part** 6:1 13:5
**particular** 11:13,14
**partners** 7:8,8
**Pat** 3:11
**Patrick** 1:9,19
**PAUL** 1:7
**paving** 17:16,17
**Pennsylvania** 1:1
1:13
**people** 7:22 9:21
12:23 13:3,13
14:5,13,15
**period** 16:3
**person** 1:3 12:2
**personal** 17:20
**personally** 6:25
**phonetic** 15:11
**Pittsburgh** 1:24
**places** 16:22
**Plaintiffs** 1:5,16
**platoons** 11:9
**please** 3:7 4:4
**plowing** 17:19
**Plus** 6:15
**point** 3:24
**pointed** 6:21
**police** 5:6,24 6:13
6:17 9:13 10:11
11:6,6,7 12:24
13:9,14,15 14:2,4
16:16 17:1,9,9,21
18:13
**positive** 8:2 9:7,10
9:18 11:4,15 16:6
**prepare** 18:22 19:1
**prepared** 4:2
**previous** 4:6
**prior** 17:8
**probably** 5:2 8:15
9:6 11:2 12:13
**prompted** 12:23
13:3
**provide** 3:18 9:4
**Public** 1:12
**pump** 14:10
**put** 6:4 11:3 12:21
**p.m** 1:13 19:16

**Q**

**question** 4:5,6 13:2
**questioning** 3:16
**questions** 3:16
12:14,15 18:8

**R**

George v. City of Erie, et al.

John Benedict

**RAE** 1:3
**ranks** 13:14 14:1
**RAYMOND** 1:4
**read** 4:3
**really** 10:4
**recall** 7:25 9:22
    10:14
**recognize** 6:4,20
**refusing** 13:20
**related** 13:19 15:21
    15:23 16:11
**relative** 3:17
**remember** 7:23
    10:17 11:13
**Renaissance** 1:14
**repair** 17:21,24
**Reported** 1:25
**reporter** 3:20
**Reporting** 1:25
**represent** 5:6 12:20
**reputation** 7:3,6
    9:13 10:22 11:25
    12:22,25 13:6,12
**respect** 7:3
**responses** 3:21,23
    4:4
**review** 18:24 19:6,7
**RICHARD** 1:8,8
**ride** 10:11 13:20
    15:2
**right** 6:7 14:17
    17:14 18:5,10,13
    18:23,25 19:6
**ripping** 17:17
**roller** 17:15
**RPR** 1:12,25
**run** 17:15

_____
**S**
**same** 11:11 18:7,12
**Saturday** 8:24
**SAVACCHIO** 1:7
**saw** 6:21 8:10 16:5
    16:6,15
**saying** 7:20 8:3
    10:18,21
**Schadel** 1:22
**scheduled** 3:12
**school** 4:19,21
**scuttlebutt** 10:19
**second** 5:12
**see** 5:19 9:1 15:8
    16:14,23
**seeing** 6:2
**seen** 5:22 6:3 8:9,23
    10:24 11:2 16:19
**session** 3:16

**share** 14:5 16:25
**shared** 13:19
**sharing** 13:5,13
    14:12,15
**sister** 15:22,22
**sit** 10:23
**Smith** 11:7
**Snow** 17:19
**some** 7:8 16:3,12,21
    18:7
**somebody** 6:21
**somehow** 15:22
    16:11
**someone** 7:2
**something** 7:2
    12:23
**source** 14:11
**speak** 12:2 15:5
**specific** 9:11
**squads** 11:9
**started** 5:2
**state** 1:14,17,20 3:7
**STATES** 1:1
**still** 4:6
**street** 1:14,17,20
    6:2,16 17:22
**streets** 4:14,25 5:4
    6:9,12,23 10:20
    12:24 13:16 14:9
    14:20 17:12,17,18
**stuff** 8:6 10:9 18:11
**Suite** 1:14,17,20
**Sunday** 8:25
**sure** 5:14,22 7:11
    7:12 8:5 9:5,15
    10:4 11:1,10 16:4
**SUSAN** 1:4
**Susie** 11:22
**sworn** 3:2
**SZYCHOWSKI**
    1:8

_____
**T**
**T** 1:9,21 3:1
**take** 16:13,23 17:22
    19:10
**taken** 1:12 3:13
**taking** 3:20
**talk** 8:7 12:25
**talked** 3:11 9:1,16
    9:17 12:10 19:3
**talking** 7:5,9 8:4
    10:16 13:10
**tell** 6:3 8:5 9:3,12
    10:23 11:2,18
    14:16 16:24
**telling** 10:17 11:21

    11:24 14:21
**testified** 3:2,24
**testimony** 4:2 18:23
**their** 6:13 14:10,12
**themselves** 12:3
**thing** 17:18 18:12
**things** 11:18 13:3
    14:21,22 17:14
**think** 8:20 10:5
    11:21,21 13:2
    16:6 18:24
**through** 5:7 7:1
    8:15
**Thursday** 12:9
**time** 4:9,10 8:11
    9:12 10:15 13:7
    16:3,15
**times** 5:19,20 16:18
**tires** 6:15 14:10
**today** 3:12 18:8,12
    18:23
**told** 5:3 7:10,21 8:1
    8:6 9:6,7,9,19,21
    10:14 11:22 14:18
**transcript** 4:1,3
    18:22
**trouble** 16:1
**truck** 13:9 15:21
    16:4,13,14
**true** 10:22 11:25
**try** 4:4,5 12:21
**trying** 14:17
**Tuesday** 1:13
**Tuttle** 19:12
**TV** 8:23
**two** 7:12,24 16:2
**type** 9:25
**types** 14:13
**typically** 16:20

_____
**U**
**ultimate** 14:11
**um-hum** 3:22
**under** 3:23
**understanding**
    13:25
**UNITED** 1:1
**unless** 6:3
**use** 6:14

_____
**V**
**v** 1:6
**VAN** 1:8
**vehicle** 17:8
**vehicles** 11:6 15:8
    16:2,9
**verbal** 3:21 4:4

_____
**W**
**waive** 18:25 19:6
**want** 7:8,12 8:19
    10:11 11:10 15:2
    15:25 19:9
**Warner** 1:14,19
**wasn't** 7:23 15:20
    16:10
**watching** 8:23
**Wednesday** 12:8,9
**week** 3:11,15 5:3
    12:6,7 18:1
**Weinheimer** 1:22
**well** 3:25 6:1 8:7
    12:5 13:4 16:5,10
    19:2
**went** 8:25 9:16 13:8
    16:13
**were** 7:4 8:4,23
    10:17,21 13:13,15
    14:21 16:2,8,12
**WESTERN** 1:1
**we'll** 4:11
**we're** 4:1
**while** 4:6 9:24
**WITNESS** 18:21
    19:2,5,7,10,12,14
**word** 19:4
**words** 3:22 11:7
**work** 4:13 6:16
    7:18 9:8,16,17,24
    14:8 17:10
**worked** 4:15
**workers** 13:16
    14:24
**working** 14:7

_____
**X**
**X** 2:1

_____
**Y**
**yeah** 3:10 6:1,8
    10:21 12:9 13:10
**year** 4:23 5:19,20
**years** 4:16 7:12,24

_____
**Z**
**Zip** 19:13

_____
**0**
**04-77E** 1:6

_____
**1**
**1** 11:7
**1:02** 1:13
**1:21** 19:16
**1001** 1:14,20

**12** 2:5
**12th** 4:20
**14** 4:16
**14th** 5:4
**1400** 1:14,20
**15219** 1:24
**16501** 1:15,17,20
**16504** 19:14
**1984** 4:24

_____
**2**
**20th** 6:11
**2004** 1:13
**2814** 19:12

_____
**3**
**3** 2:4
**300** 1:17
**38** 4:18

_____
**4**
**429** 1:23

_____
**5**
**504** 1:17

_____
**6**
**602** 1:23

_____
**9**
**9** 1:13

F

1              IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   JENNIFER RAE GEORGE, an     :  Civil Action - Law
    incapacitated person, by    :
4   RAYMOND G. GEORGE and       :
    SUSAN M. GEORGE, Guardians, :
5              Plaintiffs        :
                                 :
6              v.                :  Case No. 04-77E
                                 :
7   CITY OF ERIE, JOYCE          :
    SAVACCHIO, PAUL DEDIONISIO,  :
8   RICHARD SZYCHOWSKI, DAVID    :
    VAN BUSKIRK, RICHARD         :
9   CRAWFORD, PATRICK DURKIN,    :
    GREGORY T. DILORETO and      :
10  JOHN DOE,                    :
              Defendants         :
11

12          Deposition of DONALD MAROFSKY, taken before and
    by Carol A. Holdnack, RPR, Notary Public in and for
13  the Commonwealth of Pennsylvania, on Tuesday,
    November 9, 2004, commencing at 1:21 p.m., at the
14  offices of Marshall Dennehey Warner Coleman & Goggin,
    Renaissance Centre, 1001 State Street, Suite 1400,
15  Erie, PA 16501.

16  For the Plaintiffs:
        Alan Natalie, Esquire
17      504 State Street, Suite 300
        Erie, PA 16501
18

19  For Defendant City of Erie:
        Patrick M. Carey, Esquire
20      Marshall Dennehey Warner Coleman & Goggin
        1001 State Street, Suite 1400
21      Erie, PA 16501

22  For Defendant Gregory T. DiLoreto:
        David L. Haber, Esquire
23      Weinheimer Schadel & Haber
        602 Law & Finance Building
24      429 Fourth Avenue
        Pittsburgh, PA 15219

25          Reported by Carol A. Holdnack, RPR
            Ferguson & Holdnack Reporting, Inc.

1

1                              I N D E X

2

3    DONALD MAROFSKY

4         Direct Examination by Mr. Carey . . . . . .  3

5         Cross-Examination by Mr. Haber  . . . . . . 15

6         Cross-Examination by Mr. Natalie  . . . . . 20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      D O N A L D   M A R O F S K Y, first having

2      been duly sworn, testified as follows:

3

4                    DIRECT EXAMINATION

5  BY MR. CAREY:

6

7      Q.   Could you state your name, please.

8      A.   Donald Marofsky.

9      Q.   Could you please spell your last name.

10     A.   M-A-R-O-F-S-K-Y.

11     Q.   I butchered it in my notice to you, didn't I?

12     A.   Um-hum.

13     Q.   Sorry about that.

14     A.   I said, well, this isn't me, I don't know who

15  they're talking about.

16     Q.   Thanks for showing up even though I wrote somebody

17  else's name down.  You and I met last week.  And I told you

18  at that time that I represent the City of Erie in a lawsuit

19  that was brought on behalf of Jennifer George against the

20  City and against Officer Greg DiLoreto.  This is the time

21  for your deposition.  Have you ever had your deposition

22  taken before?

23     A.   No, I can't think of.

24     Q.   It's not much different that when you and I talked

25  except that there are other attorneys here.  I think we're

3

1    dressed a little better than I was last week.  And we have a

2    court reporter who is going to take down everything.  We're

3    basically going to ask you questions about yourself and

4    about any information you may have about this case.  And if

5    you have answers, you can provide them to us.

6              You are under oath like you would be in court if

7    you were testifying.  And the court reporter will take

8    everything down.  She will then prepare a transcript, a book

9    of all the questions and answers.

10             Because she is going to prepare a booklet, there

11   are some ground rules we have to follow.  First of all,

12   please make all of your responses verbal.  Instead of saying

13   um-hum or nodding your head or shrugging your shoulders, say

14   yes or no.  And also, too, if you'll wait until I'm done

15   asking my questions before you answer it, I'll wait until

16   you're done answering before I ask the next question.  Okay?

17        A.   Yes.

18        Q.   Where do you live?

19        A.   231 East Front, Erie, Pennsylvania.

20        Q.   Where do you work?

21        A.   City of Erie streets department.

22        Q.   And how long have you worked there?

23        A.   31 years.

24        Q.   What do you do for them?

25        A.   Truck driver, shift crew worker.  And emergency

4

1  things that come up.

2      Q.   And how old are you?

3      A.   55.

4      Q.   And how far did you go in school?

5      A.   Ninth grade.

6      Q.   Do you know Jennifer George?

7      A.   Yes.

8      Q.   How do you know her?

9      A.   I know her through her family and just in the

10  neighborhood growing up with my daughter, known her all her

11  life just about.

12      Q.   Did you become aware of the accident that she was

13  involved in over at East 14th and Parade Street?

14      A.   Yes, I did.

15      Q.   How did you become aware of that?

16      A.   On the news.

17      Q.   Okay.  And after you became aware of this

18  accident, did you go see Jennifer or did you have any

19  contact with her parents?

20      A.   I did.  Not right after.  You know, I did

21  afterwards, but not right after.

22      Q.   Okay.  Do you know Greg DiLoreto or did you know

23  Greg DiLoreto?

24      A.   I known him from just coming into work, getting

25  gas and stuff for his vehicle.  He would gas his vehicle up.

1      Q.   And he would come in, in a police car?

2      A.   Yes.

3      Q.   Did you know him outside of -- let me ask you

4 this.  When he would come in to get gas, was that at the

5 streets department?

6      A.   Yes.

7      Q.   Did he ever come in with a cruiser to have

8 anything else done, other than to get gas?

9      A.   Maybe flat tires on occasion.  Check the oil,

10 which we normally do.  And stuff like that.

11      Q.   Okay.

12      A.   Come in and clean his windows and stuff.

13      Q.   So it was minor maintenance.

14      A.   Right.

15      Q.   Did you know Greg DiLoreto outside of the streets

16 department building where he would bring his cruiser in?

17      A.   Did I know him outside of the building, no.

18      Q.   Did you ever see him drive the cruiser?

19      A.   Yeah.  Yes, I have.

20      Q.   Did you ever see him drive the cruiser outside of

21 the streets department property?

22      A.   When he would leave the garage on occasion, yeah.

23      Q.   Okay.  Can you tell me, did you observe anything

24 that stuck in your memory about the way he drove?

25      A.   Yes.  There was times -- now, I'm not saying every

1    time.  But there was times when he did come in, very

2    erratically driving, fast up to the pumps, leaving,

3    squealing tires at times.  When he would turn out into the

4    main street off of our garage, you can hear him squealing

5    the tires.  At times, not every time, but a lot of times he

6    would squeal them going up the street.

7        Q.   Do you recall him specifically doing this, as

8    opposed to other people, other officers?

9        A.   No, him.  Because he would do it on occasions

10   where it wasn't just maybe once or twice, to say, well,

11   that's Greg, you know.

12       Q.   Did you ever say anything to him about that?

13       A.   No.

14       Q.   Would you in your position have any right to say

15   anything to him?

16       A.   No.  Because I'm not his superior or nothing like

17   that, so I can't tell him how to operate his vehicle.

18       Q.   Did you ever contact anybody at the Erie police

19   department to complain about the way he drove his vehicle?

20       A.   No, I haven't.  But at times other officers -- I

21   can't remember who their names are.  But they would comment

22   on his driving too, also, that it was very dangerous.  A lot

23   of officers wouldn't want to drive with him.  They would go

24   in and ask not to go with him that evening because of his

25   driving.  Now, this is what they would tell me.

1      Q.   Do you recall who any of those officers were?

2      A.   No, I don't know their names.  Like I said, they

3 just come in and out, by face.  Like I say, it was a while

4 ago, so I really can't remember names.

5      Q.   On the streets department property where DiLoreto

6 and the other officers would bring their vehicles for flat

7 tires, or clean windows, or get gas, or whatever, isn't

8 there a -- didn't you tell me that there are a lot of -- not

9 a lot.  That there are substances down on the road surface

10 such as motor oil and things?

11     A.   Sometimes there are spots there, as I told you.

12 But when there is, we put like a drywall -- a dry-all on it

13 to absorb it.  But sometimes if there is, if he was to take

14 off.  But I'm talking 15, 20 feet of pealing tire -- or to

15 where it wouldn't matter for a spot.  To I would say it

16 would be dangerous or erratical for him to be driving like

17 that.

18       When I talked to you, I just -- I wanted to think

19 about just what I did know and remembered about it.  I

20 really don't want to say nothing at the time.  I thought

21 about it a couple days, and I remember occasions where he

22 did do that.  And another occasion I remember, even after

23 the accident happened, I remember clear in my mind.  He was

24 in the garage, cleaning his windows the one time.  And

25 inside of our garage, we're in the office, and we hear

1    somebody pealing out.  Out of our garage, out through the

2    doorways, and down through our street.  And my mind was

3    saying, this accident happened, and he's still driving like

4    this.  I mean, it just didn't seem right to me.  I would be

5    afraid to -- you know, even if that accident or whatever.

6    Inside of our building.  And there was other workers working

7    at the time when that happened too.

8        Q.   Did you see him do that?

9        A.    You could hear him doing it and you could see him

10   coming out the door, from our window.  Then when I did go

11   out into the garage to look, there was double skid marks

12   where he did take off fast and peeled out.

13       Q.   Did you or anyone else contact the City of Erie

14   and report that behavior to them?

15       A.   No, we didn't.

16       Q.   How many times before this accident occurred did

17   you see Greg DiLoreto drive in that manner, pealing out?

18       A.    I would say maybe -- geez, I would say at least

19   four or five times.  Because it was like a -- not a steady

20   time that he would do it.  But on occasion to where you

21   could remember him doing, to where -- police cruiser doing

22   that, it's kind of weird to see that and hear it.

23       Q.   Can you identify -- let me ask you this.  This

24   accident occurs.  And when is it that you find out that Greg

25   DiLoreto is involved in this accident?

9

1        A.    I believe when it was on the news.  When they did

2    announce it on the news.  I don't know what day.  If it was

3    the morning after they said his name.  Or, you know, it was

4    probably shortly after the accident that we did find out it

5    was Greg.

6        Q.    Did you have conversations with anyone at the

7    streets department after you heard about this accident,

8    about DiLoreto and his driving habits?

9        A.    Yeah.  A lot of guys have talked about it.  More

10   or less because they -- from being there working, different

11   guys on my shift crew know about his driving because they

12   also witnessed it, you know, from working there.

13       Q.    Can you identify anyone up at the streets

14   department who you've talked to about this?

15       A.    No.  I mean, just guys, to where you -- even more

16   or less guys on my shift that would be working with me, on

17   the same shift as me, you know.  Because like I say, we

18   all -- when there's guys working, there's usually three or

19   so, four guys working at a time.  So where I wouldn't just

20   more or less hear or see this, other guys that I would be

21   working with would too.

22       Q.    But you can't, as we sit here today, name names as

23   to who you would have talked to about this?

24       A.    David Stafford, Eric Popovich would -- on my shift

25   with me a lot.  Which I know they've witnessed it, him

1    coming in at times doing that also.

2        Q.    You cannot name names of anyone at the Erie police

3    department who has commented about his driving?

4        A.    No, I don't know their names.  But I know there's

5    at least three or four of them that did talk about -- say,

6    well, you know, about his erratical driving.

7        Q.    Do you recall when we talked last week?  I think

8    it was maybe Wednesday or Thursday of last week.

9        A.    Yeah.

10       Q.    And I asked you basically the same questions at

11   that time, didn't I?  You have to answer.

12       A.    Yes.  I'm sorry.

13       Q.    And at that time, do you recall telling me that

14   you could not recall ever seeing DiLoreto drive recklessly

15   at the city garage other than maybe squeal tires or drive a

16   little fast in the parking lot?

17       A.    That's what I'm talking about as far as -- now,

18   recklessly, when he would take off, he would squeal his

19   tires.  Now, if you want to call that reckless driving or

20   unsafe driving, whatever it would be.  But he would take off

21   squealing his tires to a length of spot where he would

22   squeal them to where it wouldn't just be a little chirp.  I

23   mean, he would really be on that acceleration.

24       Q.    Did you tell me that when we met before, that he

25   would squeal tires down the street 20 feet of skid marks?

1    A.    No, because I didn't -- down the street, I don't

2    know how many feet of skid marks.  But you can hear the

3    tires skidding down the street.  When I talked to you, I

4    didn't want to really say anything that I wasn't sure of.

5    So I thought -- made everything -- because you told me I was

6    going to be here.  I wanted to make sure that I thought it

7    over and I knew just what I'm telling you is the truth, and

8    I'm not making nothing up or getting into something where

9    it's not exactly right what I'm telling you.

10    Q.    Were you able when we met last week to give me the

11    names of David Stafford or Eric Popovich as being other

12    individuals at the streets department that you spoke with?

13    A.    No.  Because like I say, I did speak with other

14    people in the streets department, but those are the people

15    that would be on my shift that could probably also back up

16    saying what I'm saying about the way he used to come in and

17    out of there driving.  And I believe those two were working

18    with me the day that he did peal out of that garage after

19    the accident did happen.

20    Q.    All right.  So these two individuals you think may

21    have been present during one of these episodes.

22    A.    Yes.

23    Q.    You don't know precisely whether they witnessed

24    anything.  Is that true?

25    A.    No, but I believe, because we were all working

1    that day, I'm pretty sure.

2         Q.    These two individuals, did you ever discuss this
3    with them?

4         A.    As far as the accident and stuff like that, yeah,
5    because everybody around the garage did.

6         Q.    Did you ever discuss with these two individuals
7    DiLoreto's driving habits?

8         A.    Yeah.   We all talked about it.   I mean, he was
9    well-known for that.

10        Q.    Well-known amongst the city streets department?

11        A.    Right, guys who would be in contact with him at
12   work.

13        Q.    Is it fair to say he was well-known amongst the
14   street department workers because when he left the streets
15   department lot he would spin tires?

16        A.    That.   And, again, what other officers would tell
17   us when we talked a little bit, about his driving habits on
18   the road.

19        Q.    One last question.   Did you tell me when we met
20   last week -- you basically explained to me that the parking
21   lot is slippery because of motor oil, and that the police
22   cars are powerful cars with powerful engines, and that may
23   be why he was spinning?

24        A.    But -- now, let me explain the whole parking lot
25   isn't that like.   It would be just the area where we would

1   get our gas and check the oil.  There might be a spot like

2   transmission fluid or oil that would be in that little area.

3   I would say maybe about 2 or 3-foot area there.  But I'm

4   saying as far as him driving erratical, he would go beyond

5   that, and other spots in the parking lot where he would gun

6   that motor and peal out a little bit.

7        Q.   Have you ever talked to Attorney Natalie about

8   this?

9        A.   No, hum-um.

10        Q.   How about any investigator that was hired --

11   identified themselves as being hired by anybody involved in

12   this case?

13        A.   No.

14        Q.   Did you ever speak to any of the police

15   investigators who were looking into the cause of this

16   accident?

17        A.   No.

18        Q.   And this may be somewhat repetitive of a couple

19   other questions that I asked.  But am I correct that you

20   never went to the police who were investigating this

21   accident to tell them that DiLoreto was known by you and

22   other people at the streets department to peal out and drive

23   recklessly?

24        A.   No, I never went to anybody on it.  Nobody ever

25   approached me either.

1          Q.    Did you ever see Greg DiLoreto do any doughnuts?

2          A.    As far as doughnuts, let me think.  Not a

3     doughnut, but like a sway in the car where it would fishtail

4     out when he would take off.

5          Q.    When he peeled out, the back end would get a

6     little bit loose?

7          A.    Right, fishtail.

8          Q.    When was the last time that you spoke to Susan or

9     Ray George?

10         A.    Gee, I speak to her on occasion at work where I

11    see her.  As far as speaking to her, hello, and how you

12    doing.

13         Q.    When was the last time?

14         A.    That's even been a while ago.  I would say maybe a

15    couple months.  A couple months.

16              MR. CAREY:  Okay.  Your witness.

17

18                        CROSS-EXAMINATION

19    BY MR. HABER:

20

21         Q.    Mr. Marofsky, my name is David Haber, and I

22    represent Officer DiLoreto.  You indicated you saw four or

23    five times Officer DiLoreto come into this place fast or

24    peal out fast.

25         A.    Right.

15

1      Q.   Over how long of a period of time are you talking

2  about?

3      A.   That would be -- well, in between incidents?

4      Q.   No, no.  I mean --

5      A.   How long of a period of time since I've known him

6  coming in?

7      Q.   Yeah.

8      A.   I would say -- well, maybe four/five years,

9  whatever.  It's been a long time.

10     Q.   So we're talking maybe one time a year you would

11  see him do it.

12     A.   No, no.  Be more than one time a year.  But as far

13  as remembering in my mind to where -- because I don't know

14  how many years he has on the force or how long he's been

15  coming up there.  But it wasn't, say, maybe once a year this

16  would happen, or maybe even twice.  It would be, you know,

17  on occasion to where it would -- you know.  I wouldn't say

18  not every single time, but a lot of times when he did come

19  in, it would be the same manner.

20     Q.   Well, he would bring the police cruiser up there

21  almost every time he was out on patrol, right?

22     A.   Right.

23     Q.   If you worked four or five times a week, that

24  maybe four or five times a week he would bring it up.

25     A.   But, also, I work a second shift.  Okay.  And the

1    policemen rotate shifts.  So there's times where I won't see

2    him for a month or so.

3        Q.   I understand that.  I'm just trying to get out the

4    times that you saw him over a period of time.  I'm not

5    saying you saw him every time he came into the garage.

6    Obviously, you wouldn't be there every time.

7        A.   Right.  But I'm just saying, as far as him working

8    different shifts, I wouldn't see him for a month or so.

9        Q.   I understand that.  I'm just trying to figure out

10   how many times you saw him over what period of time.

11       A.   Right.  How many times total, I would say I seen

12   him do this?

13       Q.   Yeah.

14       A.   I don't know exactly, but I would say quite a few.

15       Q.   Well --

16       A.   I mean, I'm not going to say maybe 50 or 100

17   times.  I would say maybe 15 to 20 times as far as all the

18   times that I've known him coming in, that -- to where he

19   would leave fast or come in fast.

20       Q.   But not every time.

21       A.   Not every time, no, not every time.

22       Q.   And, generally, he was the only one in the police

23   vehicle, right?

24       A.   No, there's other times where he had people with

25   him.

1      Q.    He had another officer.

2      A.    Right.  Go ahead.

3      Q.    Now, go back to my original question.  Over what

4    period of time are we're talking about?  You know, are we

5    talking two years, three years, four years, prior to the

6    accident?

7      A.    Okay.  I would say maybe three years that I can

8    remember.

9      Q.    Okay.

10     A.    Off and on.

11     Q.    Okay.  You listed the names of David Stafford and

12   Eric Popovich.

13     A.    Right.

14     Q.    To my understanding, did they witness -- you

15   believe they witnessed when he pulled out of the garage

16   after the accident?

17     A.    Yeah.  I believe that they were working with me.

18   And we were in the office.  And we did hear the squealing of

19   the tires and him coming out of the garage.

20     Q.    Do you know if those individuals ever witnessed

21   him pulling into the pumps fast or pulling out fast?

22     A.    Yes, I would.  They would more or less have to

23   because I would -- I'm in the same working position they

24   are.  And if they did see him, they -- you know, they

25   would -- if he did do it, let's say, they would see him

1    doing it.

2        Q.    If he did it when they were working.

3        A.    Right.

4        Q.    They didn't work always the same time you did, did

5    they?

6        A.    Normally, we have the same days.   There's a few

7    days off in a week that we staggered, we have days off from

8    each other.

9        Q.    But there are times that they worked that you

10   don't work, and visa versa.

11       A.    Right, that would be weekends.

12       Q.    Okay.   Did he ever have an accident when he was

13   pealing in or pulling in?

14       A.    No.   Not that I know of, no.

15       Q.    So what you basically saw was driving fast.

16       A.    Driving fast and -- right.

17       Q.    Who is your supervisor at the garage?

18       A.    Well, we have different -- our bureau chief is

19   Pete Petrianni.   We have four or five different supervisors.

20       Q.    Did you ever talk to any of your supervisors about

21   Officer DiLoreto?

22       A.    No.

23       Q.    Okay.   And while he was doing what you described,

24   did he ever damage any City of Erie property?

25       A.    No.

1          MR. HABER:  I have no further questions.

2

3                     CROSS-EXAMINATION

4    BY MR. NATALIE:

5

6        Q.   Mr. Marofsky, I just met you today; is that

7    correct?

8        A.   Right.

9        Q.   Alan Natalie.  I represent Susan and Ray George on

10   behalf of their daughter Jennifer.  You mention that rank

11   and file officers -- I don't want to characterize your

12   testimony.  You said other officers other than Officer

13   DiLoreto would express things to streets department

14   employees including yourself; is that correct?

15       A.   Yes.

16       Q.   And those included that they did not want to ride

17   with Mr. DiLoreto because of his driving?

18       A.   Yes, you're right.  They said they would go in and

19   talk to their supervisors about it.  This is what they would

20   tell us.

21       Q.   This was my next question.  I think you said they

22   would ask not to drive with him.  Am I to assume that that

23   meant, or they were relating to you, asking their superiors

24   relief from driving with Mr. DiLoreto?

25       A.   Riding with him, right.

1      Q.    And this -- this is what they told you, that they

2   would go in and tell their supervisors not to -- or ask

3   their supervisors --

4      A.    Right.

5      Q.    -- not to drive with Mr. DiLoreto because of his

6   dangerous driving habits?

7      A.    Right.

8      Q.    Did they ever use any slang term or nickname for

9   Mr. DiLoreto?

10      A.    Well, they used to call him NASCAR.  I don't know

11   why, if he liked NASCAR driving, or if it was the way he

12   drove, I don't really know.  But guys around the garage used

13   to call him NASCAR.

14      Q.    How about rank and file police officers, did they

15   also share that nickname?

16      A.    That, I couldn't tell you.

17      Q.    Did these officers ever share specific experiences

18   with Mr. DiLoreto out on the street with you or other people

19   you worked with?

20      A.    There was one occasion.  I don't know who the

21   officer's name was.  But he did mention that he had a call

22   with him, and they had a call down on the lower east side, I

23   believe it was.  And they was up on the upper west side.

24   And the way that he drove down there really scared this

25   officer pretty good.  And he said something about making it

1   down there in record time, to where he couldn't believe they

2   were down at this call in that amount of time, in the way

3   that he was driving down there.  Which it did scare him, of

4   the way Officer DiLoreto was driving down there.  I don't

5   know who.  I could see faces, but I don't know names to

6   where --

7      Q.   Was this one of those officers who shared their

8   concern about riding with Mr. DiLoreto?

9      A.   I don't know.

10      Q.   Just one of those examples.

11      A.   Right.

12      Q.   Is it safe to say you really can't give us an

13   exact estimate or exact number of times you saw Mr. DiLoreto

14   behave the way you described --

15      A.   No.

16      Q.   Let me finish my question.  Just that you saw it

17   occasionally, not every time, but occasionally throughout

18   the three year-period that he -- that you saw him at the

19   garage.

20      A.   Right.  I can't tell you how many times, but it

21   would be times to where it would be -- well, that's -- you

22   know him, that's the way he was going to drive, that's the

23   way -- that's -- you knew that was him pealing out.  To

24   where it come -- I'm not saying used to it, but you would

25   know --

1      Q.   Would you characterize that as a habit of his?

2           MR. HABER:   Object to the form of the question.

3      Q.   Was it something he did that was consistent with

4  him?  You mentioned, well, that's Greg.  Is that what you

5  mean by that?

6      A.   Yes.

7      Q.   Is that how you would define him?

8      A.   Correct.   That would be his normal or type of

9  driving when he did come in most of the time.

10     Q.   Was that type of driving consistent with what he

11 did in the garage after the accident?

12     A.   Yes.

13     Q.   All right.  And you also heard him do this --

14 conduct this driving behavior out on the street when leaving

15 the garage; is that correct?

16     A.   Yes.  A couple times I can remember that he did

17 peal out leaving the garage onto French Street.

18     Q.   So that would be out on a public roadway?

19     A.   Yes.

20     Q.   Whereas the garage is city property?

21     A.   Right.

22     Q.   And the concerns expressed by the officers, would

23 these be with Mr. DiLoreto's driving out in the community or

24 in the garage only?

25     A.   Out in the community, on the streets.

1    MR. NATALIE:  I have nothing further.

2    MR. CAREY:  You have the right to review this

3    transcript.  She'll prepare it, and she can send

4    it to you, and you can read it and make any

5    corrections.  You can also give up that right and

6    just allow her to prepare the transcript if you

7    want.  It's your choice.

8    THE WITNESS:  I'll give up that right.  Everything

9    I said was true and honest that I can remember.

10   MR. CAREY:  You're all done.

11

12   (Deposition concluded at 1:49 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T I O N

4

5          I, Carol A. Holdnack, a Court Reporter and

6    Notary Public in and for the Commonwealth of

7    Pennsylvania, do hereby certify that the foregoing

8    is a true and accurate transcript of my

9    stenographic notes in the above-captioned matter.

10

11

12

13    _____Carol A. Holdnack_____

14              Registered Professional Reporter

15

16

17    Dated:_____11-23-04_____

18

19                    NOTARIAL SEAL
                  Carol A. Holdnack, Notary Public
20                       Erie, Erie County
                  My Commission Expires Jan. 2...
21

22

23

24

25